BRIDGET DIMICK, DEFENDANT IN ERROR, v. THE METROPOLITAN LIFE INSURANCE COMPANY, PLAINTIFF IN ERROR.

Argued March 17, 1903—Decided June 22, 1903.

1. Where a policy of life insurance makes the answers and statements contained in the application warranties, and constitutes them a part of the contract, an untrue statement concerning a matter of fact, that is, or ought to be, within the personal knowledge of the applicant, constitutes a breach of the warranty, and renders the policy void.
2. A paid-up policy calling for unconditional payment of a certain sum to the executors, administrators or assigns of the insured at his death, with reservation to the insurer of the right to pay the money to any person who has incurred expense on behalf of the insured—*Held*, to constitute "insurance in force upon his life," within the meaning of an application calling for information upon that point.
3. Appended to the policy in suit was what purported to be a copy of the application upon which it was issued, but the copy was not referred to in the body of the policy. There being a variance between the original application and the copy—*Held*, that the original application must control.
4. A policy of life insurance made the answers and statements contained in the application a part of the contract, and declared

them warranties. One part of the application declared that the answers and statements contained in it, together with those made to the medical examiner and contained in a separate part, should be the basis of the contract of insurance and become part of the contract. *Held*, that the statement to the medical examiner, signed by the applicant, is to be deemed a part of the application referred to in the policy and made a part thereof.

5. The application contained a declaration and warranty "that the answers and statements contained in it, and those made to the medical examiner, are full and true and are correctly recorded, and that no information or statement not therein contained, received or acquired at any time, by any person, shall be binding upon the company or shall modify or alter the declarations and warranties therein contained; that the persons who wrote in the answers and statements were and are our agents for the purpose and not the agents of the company, and that the company is not to be taken to be responsible for its preparation or for anything therein contained or omitted therefrom; that any false, incorrect or untrue answer, or any suppression or concealment of facts in any of the answers, shall render the policy null and void." *Held* (assuming, but not deciding, that, with respect to the insurance solicitor and medical examiner, employes of the company; who wrote the answers, the stipulation was inefficacious to constitute them agents of the applicant), yet the clauses quoted constituted a plain limitation upon the authority of the company's agents, of which the applicant was required to take notice, and by which he was bound.

6. In such a case untrue answers, entered by the solicitor and by the medical examiner, and signed by the applicant, constitute a breach of warranty, and render the policy void; provided, the answers are of such a character as, by the contract, are made warranties.

7. The common law of New York is not otherwise, at least so far as answers written by the insurance solicitor are concerned; the answers being such as the applicant himself was at liberty to insert.

On error to the Supreme Court.

For the plaintiff in error, *Robert H. McCarter.*

For the defendant in error, *John P. Stockton* and *Warren Dixon.*

The opinion of the court was delivered by

PITNEY, J.  This is an action upon a policy of insurance issued December 4th, 1899, by the defendant below (now

plaintiff in error) upon the life of John W. Dimick, payable, in case of his death, to his wife, Bridget, who was the plaintiff below. The insured died January 24th, 1900. After a trial and verdict upon pleadings held insufficient for the purpose of raising the real defence (*Dimick* v. *Metropolitan Life Insurance Co., 38 Vroom 367*), a new trial was had upon amended pleadings, and resulted in a verdict in favor of the plaintiff, rendered pursuant to the direction of the trial judge. A writ of error brings the consequent judgment here for review; and with it is returned a bill of exceptions sealed upon the direction of a verdict.

The declaration embodies a copy of the policy of insurance, with its conditions, and avers generally the performance of all conditions, pursuant to section 126 of the Practice act. *Gen. Stat., p. 2554.* The defendant pleaded the general issue, and, in a special plea, set up a breach of conditions precedent, because of false answers alleged to have been given by the insured in response to certain inquiries contained in the application for the insurance, which application, by the terms of the policy, is made a part of it; among others, the false answer, "None," in reply to the question: "State amount of insurance you now carry on your life?" the false answer, "None," in reply to the question: "Is there any other insurance in force on your life?" and the false answer, "No," in reply to the question: "Have you ever been an inmate of an asylum or hospital; if so, when and for what?"

The policy sets forth that the engagements of the defendant company are undertaken "in consideration of the answers and statements contained in the printed and written application for this policy, all of which answers and statements are hereby made warranties and are hereby made part of this contract;" that the contract is "subject to the conditions set forth on the reverse side hereof, all of which are hereby made part of this contract, and are accepted by the insured and assured as part thereof as fully as if herein recited." Among the conditions thus endorsed are the following, viz.: *"Third.* If any answer or statement in the application herein referred to is not true * * * this policy shall be void, and all

premiums paid shall be forfeited to the company, except as
provided below" (none of the exceptions has any bearing upon
this case). *"Sixth.* Proofs of death shall be made in the
manner and to the extent required by blanks furnished by
the company, and shall contain answers to each question pro-
pounded to the claimants. \* \* \* The proofs of death shall
be evidence of the facts therein stated in behalf of, but not
against, the company." And *"Ninth.* The contract between
the parties hereto is completely set forth in this policy and
the application therefor, taken together, and none of its
terms can be varied or modified, nor any forfeiture waived
or premiums in arrears received except by agreement in writ-
ing signed by either the president, vice president, secretary
or actuary, whose authority for this purpose will not be dele-
gated; no other person has or will be given authority."

The application referred to in the policy was made prior to
the date of the latter, and passed into the possession of the
company. It was made upon printed forms, and consists of
three parts, designated respectively A, B and C. Part A
is entitled "Application to the Metropolitan Life Insurance
Co.," is dated November 19th, 1899, and signed by the in-
sured and the beneficiary. It contains a statement of the
name and residence of John W. Dimick, the amount and kind
of insurance applied for, the date and place of his birth, his
present occupation, &c. The information is in the form of
written replies to printed questions. Among the questions is
this: "E. State amount of insurance you now carry on your
life, with name of company or association by whom granted,
and the year of issue. (Enumerate each.)" To this the
answer was "None." Then follow two questions, bracketed
together, and lettered "F." The first is: "If insured in this
company, in ordinary, industrial or intermediate, give policy
numbers." To this there was no reply. The second question
is: "Is there any other insurance in force on your life?" to
which the answer is "None." At the foot of this part of the
application is the following declaration, above the signatures
of the beneficiary and insured: "It is hereby declared,
agreed and warranted by the undersigned that the answers

and statements contained in the foregoing application and
those made to the medical examiner, together with this decla-
ration, shall be the basis and become part of the contract of
insurance with the Metropolitan Life Insurance Company;
that they are full and true and are correctly recorded, and
that no information or statement not contained in this ap-
plication, and in the statements made to the medical exam-
iner, received or acquired at any time by any person, shall be
binding upon the company or shall modify or alter the decla-
rations and warranties made therein; that the persons who
wrote in the answers and statements were and are our agents
for the purpose, and not the agents of the company; and that
the company is not to be taken to be responsible for its prepa-
ration or for anything contained therein or omitted there-
from; that any false, incorrect or untrue answer, any sup-
pression or concealment of facts in any of the answers, any
violation of the covenants, conditions or restrictions of the
policy, any neglect to pay the premium on or before the date
it becomes due, shall render the policy null and void, and
forfeit all payments made thereon."

Part B is entitled "Statement made to the medical exam-
iner by John W. Dimick in connection with application on
reverse side of this sheet. To be fully completed by the exam-
iner before the applicant affixes his signature. The medical
examiner will impress upon the applicant the importance of
full and truthful answers to every interrogatory." Then fol-
low numerous questions that are intended to develop the his-
tory of the applicant in all matters pertaining to his health
—he is asked specifically whether he has ever had certain
enumerated diseases; whether he is ruptured; to give full
particulars of any illness he may have had since childhood;
to state when he was last confined to the house by illness, &c.
One of the questions is this: "Have you ever been an inmate
of an asylum or hospital? If so, when and for what?" and
the answer is "No." At the foot is printed the following:
"I hereby declare that the application to the Metropolitan
Life Insurance Company for an insurance on my life was
signed by me, and that I renew and confirm my agreements

therein as to the answers given above to the medical examiner, and I hereby declare that said answers are correctly recorded." It is dated November 23d, 1899, and signed by John W. Dimick, but not by the beneficiary.

Part C is entitled as follows: "Medical examination and report (no part of the declaration of the applicant.)"

At the trial there was introduced in evidence a paid-up policy for $219, upon the life of John W. Dimick, issued by the Prudential Insurance Company on February 22d, 1897, which was in force at the time the present application was made. That it was in force at John W. Dimick's death was admitted by the plaintiff in the written proofs of death signed by her and submitted to the defendant company in compliance with the condition endorsed upon the policy in suit.

It was also in evidence that, in the year 1893, John W. Dimick was, for two weeks, an inmate of a hospital at Englewood, in which town he resided, undergoing treatment for injuries received in a runaway accident, and that he was conscious during the whole of the time that he spent in the hospital.

Notwithstanding this evidence, the learned trial justice (in view of certain rebuttal testimony introduced by the plaintiff, which will be mentioned below) directed a verdict for the plaintiff, on the ground that no breach of warranty was shown.

We are inclined to agree with the contention made in behalf of the plaintiff (now defendant in error) that the negative reply to the question, "State amount of insurance you now carry on your life," &c., is not applicable to the paid-up policy in the Prudential Insurance Company. If the question had stood alone, it would have permitted, and perhaps required, the word "carry" to be construed in its colloquial sense, as equivalent to "possess" or "hold"—a meaning probably derived, however, from the custom of holding property that has been paid for with borrowed money (*Cent. Dict.,* verb trans. "Carry," *pl.* 14), and so hardly applicable to a paid-up policy that has ceased to be a burden to the insured. But the question did not stand alone; it was immediately followed by the two questions printed under the letter "F," viz.: "If insured

in this company, give policy numbers," and "Is there any other insurance in force on your life?"· Certainly the second of these questions would not have been required if the former question was intended to apply to all ·insurance in force. Therefore, in aid of the validity of the contract, it is fair to ascribe to the word "carry" a limited sense, as applicable only to such policies of insurance as constituted a burden by requiring the continued payment of premiums.

With respect to the answer of the applicant that there was no other insurance in force on his life, counsel for the plaintiff first contends that the paid-up policy is not within the meaning of "insurance," because it constitutes simply an unconditional agreement to pay a certain sum of money, upon the death of John W. Dimick, to his executors, administrators or assigns, irrespective of the question of insurable interest or any question of indemnity against loss. This point, we think, is quite untenable. The paid-up policy was in the form ordinarily known as an insurance policy; John W. Dimick is therein designated as the insured, and is frequently referred to under that designation. Moreover, the policy reserves to the company the right to "pay the sum of money insured hereby to any relative by blood, ·or connection by marriage of the insured, or to any other person appearing to said company to be equitably entitled to the same by reason of having incurred expense in any way on behalf of the insured for his or her burial, or for any other purpose."

The next contention of the plaintiff is this: That while, in the original application, a negative reply is given to the second inquiry bracketed under the letter "F," and no reply is given to the first inquiry, yet there is attached to the policy itself what purports to be a copy of the application, and in the copy the negative reply is appended to the first question, and the second question appears as if unanswered. It is insisted that, inasmuch as this copy of the application was furnished to the insured by the company, and represented by it to be a true copy, it is, for all purposes of the policy, to be treated as the application referred to in the contract, so that the question of breach of warranty must be determined by

reference to the copy of the application that is attached to the policy, and not by reference to the original application. But this contention is overthrown by reference to the plain terms of the policy itself and to what is attached thereto. The body of the policy in nowise refers to the copy of the application thereunto attached. The policy does say that it is "subject to all the conditions set forth on the reverse side hereof, each and all of which are hereby made part of this contract." The body of the policy fills the first page of a four-page document. Upon the second page, which is literally the "reverse side" of the policy, there are printed, in bold type, the conditions already quoted, and sundry other conditions now immaterial, and these are headed "Conditions referred to on the face of this policy *as a part of this contract."* On the third page is found what is declared, at the head, to be *"Copy* of application *referred to* in this policy." The change of phraseology is significant, and is, we think, when taken together with the statements contained in the body of the policy, conclusive against the contention of the plaintiff. It is the original application, not the copy, that is made a part of the contract. The copy was furnished, doubtless, for the information and convenience of the insured, and was intended to be an accurate copy, but it is not certified to be such, and, in, the event of a variance, the original application must govern. If it was essential for the insured to have an accurate copy, he was at liberty to retain one at the time of making the application, or he might have examined the copy attached to the policy in order to detect and correct errors.

The final contention of the plaintiff upon this branch of the case is rested upon the uncontradicted testimony of one Freedman to the effect that, at the time the policy was written, he was soliciting insurance for the defendant company; that he negotiated the policy in question; that he made out the application; that, at that time, he knew there was a paid-up policy in the Prudential company upon John W. Dimick's life, but did not consider a paid-up policy as being a policy; that, before Dimick signed the application now in question, Mrs. Dimick told Freedman about the Prudential policy; and

that he told her there was not enough protection in it, and that she ought to have more insurance upon her husband's life.

With respect to the false answer contained in part B, in answer to the question whether the applicant had ever been an inmate of an asylum or hospital, the first contention of the plaintiff is that the answers contained in part B are not warranties, because they are not made such by the contract of insurance. This contention is disposed of by an examination of the contract itself. The policy makes the answers and statements contained in the application a part of the contract, and expressly treats them as warranties. Part A of the application declares that the answers and statements in part A contained, and also those made to the medical examiner, together with this declaration, shall be the basis and become part of the contract of insurance, and that no information or statement not contained in this application and in the statements made to the medical examiner shall be binding upon the company. Part B contains the declaration, signed by the applicant, "That I renew and confirm my agreements therein [that is, in part A contained] as to the answers given above to the medical examiner, and I hereby declare that said answers are correctly recorded." And part C; the medical examination, contains, in its title-line, the statement that it is "no part of the declaration of the applicant." From all this it conclusively appears that part B is a part of the application, and the answers and statements therein contained are made warranties by the contract.

The sole remaining contention of plaintiff, with respect to the breach of warranty contained in part B, is based upon the testimony of the medical examiner, to the effect that he examined the applicant at the request of the company; that he had no personal knowledge that Dimick had been in the hospital; that he had no recollection of having asked him whether he had been in the hospital, and that his impression was that he failed to ask Dimick that question, and as he (the examiner) had no knowledge that Dimick had ever been in a hospital, he therefore wrote a negative reply to the question.

It will thus be seen that, upon our interpretation of this policy of insurance (and the same interpretation was adopted by the trial judge), the answer to the question concerning other insurance in force, and the answer to the question concerning hospital treatment, were alike made warranties by the letter of the contract. But that fact is not necessarily controlling, if they are not warranties within its fair meaning and spirit. With respect to questions that relate to matters which the insurer must know are not within the personal knowledge of the applicant, and with respect to those that call, not for definite statements of fact, but for statements of belief or opinion (as, for instance, whether the applicant has ever had a certain obscure disease), the letter of the contract is to be controlled by its spirit and purpose; and the answers will be deemed warranties only of the *bona fide* belief and opinion of the applicant. *Henn* v. *Metropolitan Life Insurance Co.,* 38 *Vroom* 310; *Anders* v. *Knights of Honor,* 22 *Id.* 175. See, also, for cases illustrative of the distinction, the following: *Metropolitan Life Insurance Co.* v. *McTague,* 20 *Id.* 587, 592; *Glutting* v. *Metropolitan Life Insurance Co.,* 21 *Id.* 287; *Lippincott* v. *Royal Arcanum,* 35 *Id.* 309; *Finn* v. *Metropolitan Life Insurance Co.,* 38 *Id.* 17.

But this distinction will not avail the present plaintiff. The inquiries under consideration related to matters that, within the contemplation of the contract, were, or ought to have been, within the personal knowledge of the applicant. Both related to definite matters of fact. By the undisputed evidence, the recorded answers were in both instances untrue, to the knowledge of the applicant.

The contentions of the plaintiff are therefore reduced to this: That the consequences of these manifest breaches of warranty are to be evaded by showing that the untrue answers were inserted by agents of the company through error of judgment, negligence or stupidity. And the facts were attempted to be proved, not by any writing, authentic or otherwise, but by the testimony of witnesses as to what transpired verbally before the contract was reduced to writing and signed by the parties.

The learned trial justice adopted the view that as Freedman was in fact the agent of the defendant company for the purpose of soliciting the insurance, the recitals contained in the application to the effect "that the persons who wrote in the answers and statements were and are our agents [that is, agents of the applicant and beneficiary] for the purpose, and not the agents of the company, and that the company is not to be responsible for its preparation or for anything contained therein or omitted therefrom," &c., could not be taken advantage of by the defendant; that the defendant could not enjoy the benefits of the agency and repudiate the acts of the agent, and that since Freedman knew of the existence of the Prudential policy, and, with that knowledge, purposely and honestly, and on his own understanding of the situation, wrote the negative reply to the inquiry respecting other insurance in force, the company was bound thereby for reasons of public policy.

As to the negative reply to the question whether the applicant had been an inmate of a hospital, the trial justice treated the medical examiner as the agent of the company, and held that he had waived that question. But he did not waive it; he wrote in an answer that was precisely contrary to the fact. And so the false answer in the medical examination must stand upon the same basis with that contained in part A, unless a distinction can be found between the functions of the medical examiner and the functions of the insurance solicitor, with respect to the preparation of the application.

It may simplify the discussion of the question of law thus presented to assume at the outset (without conceding the proposition) that if the insurance solicitor and the medical examiner were in truth in the employ of the company and acting in its interest in all matters relating to the negotiation of the contract, including the preparation of the application, the express declaration of the applicant that for certain purposes they should be deemed his agents and not the agents of the company is an entire nullity, and that notwithstanding this declaration they remained for all purposes the agents of the company, and not of the applicant. Even so, the com-

pany was certainly at liberty ·to limit the powers and authority of its own agents, and third parties dealing with the agents, with express notice of the limitations thus imposed, cannot bind the principal by any act done by the agents in excess of the bounds of their authority. *Catoir* v. *American Life Insurance Co. and Trust Co.,* 4 *Vroom* 487; *Metropolitan Life Insurance Co.* v. *McGrath,* 23. *Id.* 358; *McClave* v. *Mutual Reserve Fund Life Association,* 26 *Id.* 186; *Dwelling House Insurance Co.* v. *Snyder,* 30 *Id.* 18'. Such limitation, and such express notice are set forth plainly upon the face of this application. The applicant was thereby plainly given to understand that if he desired to use that instrument as the basis of a contract of insurance with this company, he must himself assume sole responsibility for the truth and correctness of the replies made to the questions therein contained; that Freedman and the medical examiner, though they were agents of the insurance company, were without power to bind the company by any modification or alteration of the declarations made therein, such power being expressly denied to them; and that any false, incorrect or untrue answer, or any suppression or concealment of facts in any of the answers would render the policy null and void.

If persons seeking insurance and insurance companies are to be left free to enter into such contracts as they please, with reference to life insurance, it is difficult to find any. ground on which we can ignore the force of such stipulations. If a similar question were raised concerning a contract relating to any other subject-matter, not the slightest doubt would be entertained with respect to the answer that should be given. But by reason of the extreme hardship that seems to result in certain instances from avoiding contracts of insurance for reasons such as are here presented, courts have sometimes sought to escape from the force and effect of the plain letter of the instrument by an appeal to a supposed public policy.

We are not aware of any public policy that prohibits such stipulations. Insurance companies have the right to say that they will not insure lives until they are made aware of the past history and present financial standing of the applicant

by a written declaration signed by himself and made upon his own responsibility. If it is considered essential to inquire as to the amount of insurance outstanding upon his life, they have a right to insist upon a correct reply to such an inquiry as a condition precedent to the issuance of a policy. One who is largely insured may for that reason be more strongly tempted to end his own life, in case of being overcome by disasters in business. One largely insured may be more liable to assassination at the hands of those who are to receive the benefit upon his demise.

And so with respect to the inquiry whether the applicant had ever been an inmate of an asylum or hospital. It may often be the case that this fact itself has no bearing upon the expectancy of life of the applicant. In the present case it appears that Dimick's treatment in the hospital was for the results of a not very serious accident, and that this accident had nothing to do with producing his death. But it is matter of common knowledge that while a patient is confined in a hospital he is subjected to rigid scrutiny by physicians and nurses, and that in some cases a record is kept of his general physical condition. Such a record might disclose important matters respecting the constitution of the patient, although not connected with the disease or injury for which he underwent treatment. It is therefore not unreasonable for insurance companies to require a full disclosure from applicants concerning any hospital treatment that they have undergone in the past, in order that a full investigation of everything relating to the expectancy of life may be conducted.

It is sufficient, however, to say that the parties to this contract have themselves treated these replies as material for the purpose of the contract. We are aware of no rule of law that prevents them from doing so. If there be any public policy to the contrary it is for the legislature and not for the courts to declare it. With respect to fire policies, our legislature has thought fit to enact (*Gen. Stat., p.* 1766, §§ 121, 122, &c.) that property in this state shall not be insured excepting under a standard form of policy. No similar provision exists with respect to life insurance.

There is a principle of public policy that we find imbedded in the common law and that furnishes the underlying reason for the rule of evidence that written contracts are not to be varied or altered by parol testimony. It was well expressed by the late Chief Justice Beasley, when he said (*Dewees* v. *Manhattan Insurance Co.,* 6 *Vroom* 366, at *p.* 375) : "That the common good requires that it shall be conclusively presumed, in an action at law, in the absence of deceit, that the parties have committed their real understanding to writing. Hence it necessarily follows that all evidence merely oral is rejected, whose effect is to vary or contradict such expressed understanding. Such rejection arises from the consideration that oral testimony is unreliable in comparison with that which is written. It is idle to say that the estoppel, if permitted to operate, will prevent a fraud or inequitable result; most parol evidence contradictory of a written instrument has the same tendency; but such evidence is rejected, not because, if true, it ought not to be received, but because the written instrument is the safer criterion of what was the real intention of the contracting parties."

It may be added that while fraud or deceit, proved by word of mouth merely, may render void a written contract, and leave the parties where they stood, it will not, in a court of law, be accepted as making for the parties a different engagement from that which they have deliberately expressed in writing. Nor can a material part of an entire contract be avoided, leaving the residue of the stipulations to stand.

In this state the elementary principle now declared has been uniformly applied to contracts of fire insurance. In *Franklin Fire Insurance Co.* v. *Martin,* 11 *Vroom* 568, where the insurance was obtained through an agent of the company, who inspected the premises at the time of taking the proposal and knew the manner in which they were used, the trial judge left to the jury the determination of the question whether the parties themselves did not knowingly use the term "boarding-house" for the purpose of describing what was, in truth, a country tavern. This court held that such evidence was not admissible to vary the terms of the written contract, and

that it could not be received to raise an estoppel *in pais,* and thereby conclude the insurer from setting up the defence that the policy was void by reason of a breach of the conditions upon which it was written.

In *Carson* v. *Jersey City Insurance Co.,* 14 *Vroom* 300, the Supreme Court held that a stipulation in a policy that "no agent of this company is authorized in any respect to change the terms and conditions of this policy, and they shall neither be changed nor waived except in writing, signed by the president and secretary," did not apply to a condition that was to be performed after the loss had occurred, such as the furnishing of proofs of loss, and that a condition of this character might be waived by parol; but the decision recognized that the stipulation did apply to those conditions and provisions in the policy which relate to the formation and continuance of the contract and are essential to its binding force while it is running.

In *Bennett* v. *St. Paul Fire and Marine Insurance Co.,* 26 *Vroom* 377, the policy declared that it should be void if the assured at the time had any other insurance upon the premises. The defendant pleaded that there was such other insurance. The plaintiff replied that, at the time the policy was made and the premium paid, the defendant knew of the existence of other insurance, and with this knowledge issued the policy sued on. Upon demurrer to the replication the Supreme Court gave judgment for the defendant.

And in *Ellison* v. *Gray,* 10 *Dick. Ch. Rep.* 581, the attempt was made to obviate the force of a stipulation contained in a policy requiring a renewal premium to be paid before the expiration of the term of the original insurance, on the ground of a verbal representation made by an employe of the insurer, in the presence and without the dissent of the general agent, to the effect "that the contract would hold just the same as though it had been paid for prior to the expiration of the contract." This court held the insurers bound by the terms of the policy, upon the authority of the Dewees and Martin cases.

These cases related to policies of fire insurance; but the fundamental principle applies to all contracts in writing.

The Supreme Court of the United States at one time expressed a somewhat contrary view. *Insurance Co.* v. *Wilkinson,* 13 *Wall.* 222. But even that case does not go to the extent that would sustain the present action, for there it did not appear that any limitation of the agent's authority was brought to the notice of the applicant for insurance, and the opinion expressly bases the decision on that ground. This case was cited and its reasoning overthrown by Mr. Justice Depue in the Martin case. And the later decisions in the Federal Supreme Court are in accord with the rule as established in this state. *New York Life Insurance Co.* v. *Fletcher,* 117 *U. S.* 519 (where the court distinguished the Wilkinson case on the ground just mentioned) ; *Northern Assurance Co.* v. *Grand View Building Association,* 183 *Id.* 308.

The almost universal enforcement in other jurisdictions of the rule that we have adhered to in this state will become apparent by reference to the numerous cases from the English reports and from state reports, which are cited and exhaustively reviewed in the learned opinion of Mr. Justice Shiras in the case last cited.

But counsel for the plaintiff insists that the contract here in suit was made in the State of New York, and was to be there performed, and that its validity and construction must therefore be determined according to the law of that state. 1 *Chit. Cont.* 128, &c. The trial, however, seems to have proceeded upon the theory that the law of this state should control. As to the place of making, the proofs render it at least doubtful whether the contract was made in New York, and so the direction of a verdict for the plaintiff cannot be sustained on that ground. Dimick and his wife resided at Englewood in this state, and he there followed his trade as a carpenter. The application was there made out, signed and delivered to defendant's agent. There is no specific proof to show where the policy itself was actually delivered, outside of its own recitals. In the absence of anything to show that Dimick or his wife departed from their home to receive it,

the presumption would be that it came to their hands where they resided.  The recital in the body of the policy that it was signed and delivered at the office of the company in the city of New York is perhaps evidential to the contrary, but is certainly not controlling.

The place of performance is likewise obscure.  The contract was of the form known as an endowment policy, and in it the company agreed to pay the sum therein specified to the insured at its home office in the city of New York upon surrender of the policy at the expiration of twenty years from its date, and did further agree, in case the insured should die prior to that date, to pay said sum to Bridget Dimick, if living, otherwise to the legal representatives of the insured, upon the receipt by the company at its home office and its approval of the proofs of death, and upon the surrender of the policy. It therefore is not clearly expressed that, in the event of the death of the insured, payment was to be made to the beneficiary at the home office.  As both she and her husband lived in this state at the time the policy was written and at the time of his death, and as a debtor under ordinary circumstances is obliged to seek out the creditor for the purpose of making payment in the absence of a stipulation to the contrary, it becomes a matter of doubtful construction, upon the terms of the contract, whether it was to be performed in this state or in the State of New York in the event that has transpired. Upon this question we at present express no opinion.

But since the plaintiff has raised the question of the law of New York, and since we have reached the conclusion that a *venire de novo* is necessary, we think it proper to express our views upon the question.

By force of our revised act concerning evidence (*Pamph. L.* 1900, *p.* 370, § 26) "the reports of the judicial decisions of other states and countries may be judicially noticed by the courts of this state as evidence of the common law of such states, and the usual printed books of such reports shall be plenary evidence of such decisions."

We have found ourselves much embarrassed in this inquiry by reason of the great contrariety of the views that have found

expression in the reports of our sister state upon the topic, owing, doubtless, in large part to the fact that in their system the legal and equitable jurisdictions are consolidated, and the appropriate remedies, perhaps, sometimes confounded. We commence, however, with the reasonable presumption that so fundamental and salutary a rule as that which requires that a written contract shall speak for itself, and that engagements which the parties have deliberately chosen to embody in that form are not to be varied or controlled by the verbal declarations made at and before the execution of the contract, resting as this rule does upon fundamental principles of general public policy, is not to be considered as non-existent in a given jurisdiction until clear evidence to that effect is adduced from its reported decisions. Indeed, the New York reports furnish abundant evidence that, with respect to contracts in general, the rule is fully recognized and enforced. Do they show that it is not recognized or not enforced, with respect to contracts of insurance, under circumstances such as here presented?

The precise question is whether a false answer, in writing, to a material inquiry contained in an application for insurance is there held not to be a breach of the warranty, although the application and the policy alike makes these answers warranties; and whether this is so held in an action at law, brought not for the purpose of reforming or setting aside the agreement, but for the purpose of a recovery upon it according to its terms; the sole ground for sustaining the action, in spite of the apparent breach of warranty, being this, that the truth was known to and was ignored by an agent of the insurer, who acted in the preparation of the application, the application itself in effect declaring that the applicant shall be responsible, and solely responsible, for the truth of the answers therein made, and for their correct recording, and that the agent of the company, if permitted by the applicant to write down the answers, has no authority to bind the company by entering an incorrect answer.

For the latest authoritative decision in New York we are referred to *Sternaman* v. *Metropolitan Life Insurance Co.,*

170 *N. Y.* 13, a case decided a little over one year ago. This appears to have been an action at law brought to recover upon a contract similar to the one now in suit. The defendant set up a breach of warranty, consisting of a false answer to one of the questions contained in part B of the application, which was signed by the applicant and witnessed by the medical examiner. Upon the trial plaintiff's counsel offered to prove that the answers in this part of the application were filled in by the physician in his own handwriting; that the insured stated to him his medical history, including an account of numerous illnesses, more or less important, from which he had suffered, and described the treatment he had undergone, and that the medical examiner said they were not of enough importance to be inserted in the application. The evidence thus proffered was excluded as incompetent, immaterial and in violation of the contract, on the ground that the plaintiff could not, by parol, vary the terms of the application and contract. The Court of Appeals reversed the judgment, Judge Vann delivering the opinion of the majority, and Judge Gray a dissenting opinion, with the concurrence of Chief Judge Parker. Although the reasoning of the judges covered the whole topic that we have discussed, the precise question decided was quite narrow. It will be observed at once that it related to an answer contained in part B of the application, and has no bearing upon part A, out of which a part of the present controversy arises. Vann, J., in his opinion, states expressly: "The parties to the policy in question might agree that the person who filled out part A of the application was the agent of the insured, and not of the company. There is a difference in the nature of the work of filling out the blank to be signed by the insured, and that of filling out the blank furnished for the use of the medical examiner. The former is the work of the insured, and may be done as well by one person as by another. He may do it himself or appoint an agent to do it for him. It is quite different, however, with the work of the medical examiner, because that requires professional skill and experience, and the insurer permits it to be done only by its own appointee.

The insured can neither do that work himself nor appoint a physician to do it, because the insurer very properly insists upon making the selection itself." That decision is not controlling upon the present case, because of the distinction that the court itself pointed out.

But, again, the Sternaman case was decided after the making of the contract now in suit, and the rule there enunciated may be said not to have entered into the contemplation of the present contracting parties. We have, therefore, examined the earlier New York cases, among others, the following: *Chase* v. *Hamilton Insurance Co.* (1859), 20 *N. Y.* 52; *Rohrbach* v. *Germania Fire Insurance Co.* (1875), 62 *Id.* 47; *Alexander* v. *Germania Fire Insurance Co.* (1876), 66 *Id.* 464; *Van Schoick* v. *Niagara Fire Insurance Co.* (1877), 68 *Id.* 434; *Sprague* v. *Holland Purchase Co.* (1877), 69 *Id.* 128; *Whited* v. *Germania Fire Insurance Co.* (1879), 76 *Id.* 415; *Flynn* v. *Equitable Life Insurance Co.* (1879), 78 *Id.* 568; *Grattan* v. *Metropolitan Life Insurance Co.* (1880), 80 *Id.* 281; another of the same name (1883), 92 *Id.* 274; *Fowler* v. *Metropolitan Life Insurance Co.* (1889), 116 *Id.* 389; *O'Brien* v. *Home Benefit Society* (1889), 117 *Id.* 310; *Berry* v. *American Central Insurance Co.* (1892), 132 *Id.* 49; *Cross* v. *National Fire Insurance Co.* (1892), *Id.* 133; *Quinlan* v. *Providence Washington Insurance Co.* (1892), 133 *Id.* 356; *Baumgartel* v. *Providence Washington Insurance Co.* (1893), 136 *Id.* 547; *McNally* v. *Phœnix Insurance Co.* (1893), 137 *Id.* 389; *Moore* v. *Hanover Fire Insurance Co.* (1894), 141 *Id.* 219; *Forward* v. *Continental Insurance Co.* (1894), 142 *Id.* 382; *Wood* v. *American Fire Insurance Co.* (1896), 149 *Id.* 382; *Robbins* v. *Springfield Fire Insurance Co.* (1896), *Id.* 477.

These cases show that the Court of Appeals of New York has not adhered with entire consistency to any definite rule. In most cases, however, where the insured acted with express notice of limitations upon the authority of the insurer's agent, he was not permitted to bind the insurer by the acts of the agent done outside of such limitations. None of the cases is strictly in point with the present. The one most nearly so is the Sternaman case, already distinguished.

Our review satisfies us that, by the common law of the State of New York, the plaintiff in an action at law upon a life insurance policy may not avoid the effect of a warranty contained in the application, on the ground that an agent of the company knew the facts and incorrectly entered them in the application, where the instrument itself contains an express limitation upon the powers of the agent such as is contained in the application before us. At least this is true so far as answers written by the insurance solicitor is concerned; the answers being such as the applicant himself was at liberty to insert.

The judgment of the Supreme Court should be reversed, and a *venire de novo* awarded.

*For affirmance*—Bogert, Vredenburgh. 2.

*For reversal*—The Chancellor, Chief Justice, Van Syckel, Garrison, Fort, Garretson, Hendrickson, Pitney, Swayze, Voorhees, Vroom, Green. 12.