## PAULHAMUS v. SECURITY LIFE & ANNUITY CO.

(Circuit Court, M. D. Pennsylvania. July 16, 1908.)

No. 81, January Term, 1907.

1. INSURANCE—LIFE INSURANCE POLICY—CONSTRUCTION—WHAT LAW GOVERNS.

Where a life insurance policy sued on was a Pennsylvania contract, plaintiff's right to recover thereon in the federal courts sitting in Pennsylvania will be governed by the law of that state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 173–175.]

2. SAME—MISREPRESENTATIONS ACT PA. JUNE 23, 1885 (P. L. 134).

Act Pa. June 23, 1885, § 1 (P. L. 134), provides that, whenever the application for a life insurance policy contains a clause of warranty of the truth of the answers therein contained, no misrepresentation or untrue statements in such application, made in good faith by the applicant, shall effect a forfeiture or be a ground of defense in a suit on any policy issued on faith of such application, unless the misrepresentation relate to some matter material to the risk. Held, that a misstatement of fact warranted to be true, which is material, will avoid the policy, regardless of the ignorance or good faith of the warrantor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 568.]

3. SAME—DISCLOSURE OF DISEASE—NOTICE.

Where insured stated that he had been operated on for undescended testicle, and gave the names of the physicians who attended him, by which the exact nature of his trouble could have been ascertained, his statement was sufficient to put the insurance company on inquiry; it not being expected that the answers in the application should be more than general.

4. SAME—APPLICATION—ATTACHMENT TO POLICY.

Act Pa. May 11, 1881, § 1 (P. L. 20), requires insurance companies to attach to policies correct copies of the application as signed by the applicant, where the application is made a part of the policy, and declares that, unless so attached, no such application shall be received in evidence in any controversy between the parties to or interested in the policy, nor is the application to be considered a part of the policy or contract. Held, that where the terms of a policy sued on made the statements in the application and those made by the insured to the company's medical examiner warranties and a part of the contract, both, though on separate sheets, were nevertheless a part of the application, so that the statements so made to the medical examiner, not having been attached to the policy, could not be availed of by the insurer to show a breach of warranty.

5. TRIAL—MOTION FOR JUDGMENT—SPECIAL VERDICT—EFFECT OF EVIDENCE.

Where, in an action on a life insurance policy, the case was before the court on a motion for judgment on a special verdict, the only material question concerning the report of insurer's medical examiner, on which the policy was issued, was as to the legal effect to be given thereto under the facts reported; it being immaterial as to how it was introduced in evidence.

6. INSURANCE—ACTION ON POLICY—DIRECTED VERDICT.

Where, in an action on a life insurance policy which was a Pennsylvania contract, defendant's entire defense rested on alleged breaches of warranty contained in the medical examiner's report, which was not attached to the policy, and was therefore unavailable to defendant under the express provisions of Act Pa. May 11, 1881, § 1 (P. L. 20), plaintiff was entitled to a directed verdict on proving the policy, proofs of death, and nonpayment.

At Law. Action on a policy of life insurance.

At the trial the court submitted certain questions, which were answered by the jury as follows:

(1) When C. E. Paulhamus, in applying for the policy of insurance in suit, stated that his former occupation had been that of a painter and paper hanger, and that his present occupation was that of real estate and insurance, no other statement being made as to any other present occupation—

(a) Was that a full, complete, and true answer? Answer: Yes.

(b) Was it material to the risk that he should answer truthfully as to such occupation? Answer: No.

(c) Did he answer as he did in good faith? Answer: Yes.

(2) Was the undescended testicle, for which C. E. Paulhamus was operated upon in November, 1899, in a cancerous condition? Answer: No.

(3) The said C. E. Paulhamus, in reply to the question: "Have you ever had any serious illness or disease, except diseases incident to childhood? If so, give particulars"—having answered, "Yes, operation five years ago for hernia," and also to the questions put by the company's medical examiner: "How long since were you attended by a physician or professionally consulted one? For what disease? Give full particulars as to date, duration, severity, etc., of each disease you have had. Give the name and residence of attending physician"—having answered: "(A) Five years. (B) Surgical case. Operation for undescended testicle. (C) Dr. G. D. Nutt, Williamsport, Pa. (D) Dr. J. W. Van Horn, Montoursville, Pa."—

(a) Did he, in so answering, make full, complete, and true answers with regard thereto? Answer: Yes.

(b) Were the answers that he so gave full, complete, and true, so far as he had information or knowledge? Answer: Yes.

(c) Did he answer in good faith? Answer: Yes.

(d) Was it material to the risk that he should answer truthfully in the premises? Answer: Yes.

(4) When C. E. Paulhamus, in applying for the insurance policy in suit, in reply to the question put by the company's medical examiner: "Have you hernia, or have you ever been ruptured? If so, do you now wear a suitable truss?"—answered, "No"—

(a) Was this true? Answer: No. (b) Did he so answer in good faith? Answer: Yes. (c) Was this a matter material to the risk? Answer: Yes.

(5) When C. E. Paulhamus, in applying for the insurance policy in suit, in reply to the questions put by the company's medical examiner: "Have you ever had cancer, or any tumor, enlarged glands, or abscesses," answered "None"—

(a) Was that a true answer? Answer: No.

(b) Did he so answer in good faith? Answer: Yes.

(c) Was it something material to the risk? Answer: Yes.

(6) When C. E. Paulhamus, in applying for the insurance policy in suit, in reply to the question put by the company's medical examiner: "Have you had any illness, disease, or injury, other than as stated by you above? If so, state full particulars"—made answer, "None, except mild diseases of childhood"—

(a) Was that true? Answer: No.

(b) Did he answer in good faith? Answer: Yes.

(c) Was that a matter material to the risk? Answer: Yes.

(7) When C. E. Paulhamus, in applying for the insurance policy in suit, in reply to the question put by the company's medical examiner: "Have you, or any of your family or relatives, ever been under treatment at any hospital, asylum, cure, or sanitarium?"—answered, "No"—

(a) Was that true? Answer: No.

(b) Did he so answer in good faith? Answer: Yes.

(c) Was that a matter material to the risk? Answer: Yes.

The jury thereupon, at the suggestion of the court, returned the following special verdict:

We, the jurors impaneled in this case, do find the following to be the facts, and make return thereof, and of the answers which we have made to certain questions submitted by the court, which together herewith are to constitute a special verdict:

(1) The plaintiff, Harriet C. Paulhamus, is the widow of Cameron E. Paulhamus, deceased, and the beneficiary named in a policy of insurance taken out by the said C. E. Paulhamus in the Security Life & Annuity Company of America, defendant, on December 16, 1905, for the sum of $3,000, a copy of which is attached to the plaintiff's statement and made a part hereof.

(2) There was duly paid to the said company by the said C. E. Paulhamus the sum of $92.31 on account of the first premium due on said policy, which, with the 25 per cent. advanced by the company at his request under the provisions of the policy, paid the first premium due thereon in full.

(3) The said C. E. Paulhamus departed this life August 24, 1906, within the first year after the date of said policy, as the result of a surgical operation for a tumor, from loss of blood or shock. Due notice of the loss was given to the said company, and proofs of death were made in accordance with the requirements of the policy, which proofs were received by the company September 5, 1906.

(4) Indorsed on the back of the said policy is the following:

#### "Application.

"I hereby apply to the Security Life & Annuity Company of America for *a policy* of *$3,000* on my life, upon the *20 Pay A. D.* plan. Amt. annual premium, *$123.06.*

"1.—My full name is *Cameron Else Paulhamus,* and I reside at No. *West Broad* St., in the city of *Montoursville,* county of *Lycoming,* state of *Pennsylvania.*

"2.—My former residence was *Williamsport, Pa.* My former occupation has been *Painter & Paper hanger.* My present occupation or business is (state specifically the kind of business) *Real Estate & Ins.* My other occupations are ———.

"3.—My place of business is *W. Broad St.,* and my P. O. address is *Montoursville, Pa.*

"4.—I was born on the *21st* day of *July,* 1869, in *Montoursville, Pa.*; age (nearest birthday) *36.*

"5.—The full name of the beneficiary to whom the insurance is to be payable is *Harriet Champion Paulhamus,* residing in *Montoursville, Pa.*

"6.—The relationship of the beneficiary to me (the person proposed for insurance) is *wife.*

"7.—The age of the beneficiary (nearest birthday) is *34.*

"8.—The insurable interest, if other than a relative, is ———.

"9.—The premium on this contract is to be *$123.06,* payable *annually* in advance; and the policy is to be issued on the advance dividend plan, under which the company agrees to advance for me, against the policy contract, *25%* of each premium during the advance dividend period of *twenty* years, which advances are to bear interest at 3½% annually compounded, until paid by the application of dividends or otherwise. The contract is to contain a guarantee to cancel these advances and interest in the event of my death during the advance dividend period.

"10.—I am now insured for $——— in the following companies or associations, to wit: ———.

"11.—Have you ever (a) been declined or postponed by any life insurance company, or received a policy different in form from the one originally applied for; or (b) been intemperate; or (c) had any serious illness or disease, except diseases incident to childhood? If so, give particulars. (d) Is there any history of insanity or consumption in your family, i. e., among parents, broth-

ers or sisters, uncles or aunts? If so, give particulars. (a) *No.* (b) *No.* (c) *Yes. Operation 5 years ago for hernia.* (d) *No.*

"I have paid *$92.31* to the undersigned soliciting agent, and have been furnished with his receipt for the same to make the insurance herein applied for binding from the date of approval by the company's medical director.

"I hereby agree that, if I have made an error in the statement of my age as given above, the company may adjust the insurance so as to conform to my true age, either by an increase in premium or proportionate reduction in the amount of insurance.

"I hereby agree that, if any premiums on said insurance be not duly paid, all previous payments shall be forfeited, except as provided in the company's contract.

"I hereby agree that, in case the premiums are not paid annually in advance, the unpaid portion of each annual premium shall be a lien on the contract and on any renewal thereof.

"I hereby agree that active service in the army or navy in time of war shall invalidate the insurance, unless a permit for such service shall have been applied for and granted by the company, and the extra premium paid on notifications; and it is agreed that at any time within one year after the date of the issue of the contract travel and residence in the torrid zone, and engagements in any of the following occupations or employments: Handling electric wires or dynamos, blasting, mining, submarine labor, aëronautic ascensions, the manufacture, handling, or transportation of inflammable or explosive substances, or services in any switching or coupling of cars—will render the contract, and any and all renewals thereof, void; and that self-destruction, sane or insane, and death in consequence of violation of law, within the above period, are not risks assumed by the company under this contract.

"I further agree that in any distribution of surplus the principles and methods which may then be in use by the company for such distribution, and its determination of the amount equitably accruing to this contract, shall be and are hereby ratified and accepted by and for every person who shall have or claim any interest in this contract.

"It is hereby agreed that all the foregoing statements and answers, and also those I make to the company's medical examiner, are warranted to be full, complete, and true, and are offered to the company as a consideration for the contract, which shall not take effect until this application has been accepted by the company, at the executive office in Philadelphia, Pa., and the first premium shall have been paid to and accepted by the company, or an authorized agent, during the life and good health of the person herein proposed for insurance. It is also hereby agreed that all claims of every kind against the company, and all liability of the insured, shall terminate whenever this contract ceases to be in force, except as otherwise expressly stipulated in the contract. I have read a sample blank form of the contract applied for, to be issued on the above-named plan, and I hereby accept the conditions of the same, and I agree that no statements, promises, or information made or given by the person soliciting or taking this application shall be binding on the company, unless such statements, promises, or information be reduced to writing, and presented to, and approved by, the officers of the company at the executive office. The agreements made in this application and contract applied for, taken together, shall constitute the entire contract between the parties hereto.

"I hereby waive my privilege to have my physician refuse to answer questions respecting my health.

"Dated at *Montoursville* this *11th* day of *December*, *1905.*

"*Cameron Else Paulhamus*, Applicant."

This is a true copy of the paper signed by the insured, except that at the foot of said paper appears the following: "Witness: E. T. Morrison"—and on the side: "To be examined by Dr. W. B. Konkle. Address: Montoursville, Pa."

(5) The said C. E. Paulhamus was examined on behalf of said company, before the said policy was issued, by Dr. W. B. Konkle, and on a separate paper made answer in writing to the questions put to him by Dr. Konkle, which paper he also signed, a copy of which, and the report of Dr. Konkle as the company's medical examiner, are as follows:

REPORT OF EXAMINING PHYSICIAN.

## SECURITY LIFE AND ANNUITY COMPANY OF AMERICA.

Name of Applicant, Cameron Else Paulhamus.  Residence, Montoursville, Pa.  Occupation (be specific), Real Est. & Ins.  Date of birth?  July 21, 1869.

| | |
|---|---|
| 1. A. Are you now in good health?  B. Have you been successfully vaccinated? | A. Yes.  B. Yes. |
| 2. A. How long since were you attended by a physician or professionally consulted one? <br> B. For what disease?  Give full particulars as to date, duration, severity, etc., of each disease you have had. <br> C. Give the name and residence of attending physician. <br> D. Give the name and residence of your medical adviser, or family physician, to whom you now refer for a certificate if deemed necessary. <br> E. Has any medical examiner given an unfavorable opinion of your physical condition with reference to life insurance or otherwise? | A. 5 years.  B. Surgical case.  Operation for undescended testicle. <br><br> C. Dr. G. D. Nutt, Williamsport, Pa. <br><br> D. Dr. J. W. Van Horn, Montoursville, Pa. <br><br> E. No. |
| 3. A. Have you hernia, or have you ever been ruptured?  B. If so, do you now wear a suitable truss?  C. Do you agree to wear one while insured? | Examiner will note, under Remarks, if Truss is satisfactory. <br> A. No.  B. ....  C. .... |
| 4. A. Do you use intoxicating liquors?  If so, to what extent (average per day)? <br> B. Have you always been temperate in their use?  (If not, explain the duration and extent of excess, and when last.) <br> C. Are you engaged *in any way* in the sale or manufacture of liquors? <br> D. Do you use tobacco?  If so, in what form and to what extent? | A. No—none. <br><br> B. Yes. <br><br> C. No. <br><br> D. Moderately. |
| 5. A. Have you ever or do you now use opium, or its derivatives, chloral, cocaine, or any narcotic, unless regularly prescribed by a physician?  (If so, explain fully.) | A. No. |
| 6. A. Have you had insanity, apoplexy, palsy, vertigo, convulsions, sunstroke, congestion, inflammation, repeated or severe headaches, or any other disorder of the brain, or nervous system? <br> B. Have you had asthma, consumption, spitting of blood, habitual cough, expectoration, palpitation, or any disease of the throat, heart or lungs? <br> C. Have you ever had cancer or any tumor, enlarged glands or abscesses, chronic diarrhœa, discharge from the ear, dropsy, fistula, gall-stones, gravel, appendicitis or disease of stomach, or intestines, open sores, inflammatory rheumatism, gout, syphilis or stricture, or any disease of the liver, kidneys or bladder? <br> (Note.—Answers as to syphilis, stricture, etc., may be given to the physician in confidence.) <br> D. Have you any defect in hearing or eyesight, any malformation or varicose veins? | A. None. <br><br><br> B. None. <br><br><br> C. None. <br><br><br><br><br> D. None. |

7. Have you had any illness, disease or injury other than as stated by you above?  (If so, state full particulars.)  None, except mild diseases of childhood.

8. Have you, or any of your family or relatives, ever been under treatment at any hospital, asylum, cure, or sanitarium?  No.

**9. Family History.**—The Medical Examiner will please obtain from the applicant, answers in full to the following questions:

| | Age [If Living] | Condition of Health | Age at Death | Cause of Death | How Long Ill | Previous Health | Was it Consumption | Father's Father | Age if living | Age at death |
|---|---|---|---|---|---|---|---|---|---|---|
| Father. | | | 54 | Bright's Dis. | 1 yr. | Good | No | Father's Mother | | 76 |
| Mother. | 60 | Good | | | | | | Mother's Father | | 55 |
| How Many Brothers Have You Had?  17 | 17 | " | | | | | | | | 78 |
| How Many Sisters Have You Had?  2 | 2 | | 8 | Scarl. Fev. Chorea | Few days 6 mnths. | Good " | No " | Mother's Mother | | 57 |
| | | | 11 | | | | | | | |

**10. A.** How many members of your family, uncles and aunts included, have ever had, or now have, consumption? None. Cancer? One. Paralysis or apoplexy? None. Disease of the heart? None. Insanity? None.

**B.** Give relationship and particulars. Mother's mother died of cancer. Have you during the last year been associated with a person who has or has had consumption? No. Are you living in a house recently occupied by a consumptive? (Explain fully under Remarks.) No. Is your occupation considered dangerous? No.

**It is hereby agreed:** That all the foregoing statements and answers, made to the Company's Medical Examiner, are warranted to be true, and are offered to the Company as a consideration of the contract.

(*Signature of the person to be insured.*)   CAMERON E. PAULHAMUS.

*Witnessed by the Examiner.*   W. B. KONKLE.

---

**11. A.** How long have you personally known the applicant? 5 years. **B.** Does the applicant's appearance indicate good health? Yes.

---

**12. A.** Applicant's height, 5 ft. 11 in. Weight, 170 lbs. **B.** Circumference of chest on full expiration (under vest), 35½ in. **C.** Circumference of chest on forced inspiration (under vest), 38 in. **D.** Girth of abdomen (inside trousers), 32 in. **E.** Did you weigh him? No. **F.** Are these figures correct? Yes. **G.** Is he gaining or losing weight? No.

---

**13. A.** Race, white. **B.** Complexion, fair. **C.** Shape of chest, broad. **D.** General figure, erect. **E.** Give some mark of identification. Knife mark, left arm.

---

**14. Examination of Heart.**

| | |
|---|---|
| **A.** Is the heart's action clear, regular and normal in its force? | A. Yes. |
| **B.** Is there any murmur, with either sound, or any enlargement of heart? | B. No. |
| **C.** Is there any atheroma of the radial or temporal arteries, or increased tension? | C. No. |
| **D.** What is the character of the pulse as to fullness, compressibility and strength? | D. Normal. |
| **E.** Is it regular? **F.** What is the pulse rate per minute? | E. Yes.  F. 74. |

---

**15. Examination of the Lungs.**

| | |
|---|---|
| **A.** What is the number of respirations per minute? | A. 16. |
| **B.** Is the respiration full and uniform throughout each lung? | B. Yes. |
| **C.** Is there freedom from unusual sound throughout each lung? | C. Yes. |
| **D.** Is the percussion normal throughout each lung? | D. Yes. |
| **E.** Is there any disease of the throat, or any cough? | E. No. |

---

**16. Examination of the Brain, Digestive Organs, Etc.**

**A.** Has the applicant any disease or disorder of the brain or nervous system? No. **B.** Has the applicant ever had syphilis or stricture? No. **C.** Is there any eruption on the body? No. **D.** Is there any discharge from the ear? No. **E.** Is there any evidence of disease of the stomach, bowels or liver? No. **F.** Has he had any disease or disorder which affects his present health? No. **G.** How do you rate the risk— (first-class, good, fair or bad)? Yes.

---

**17. Examination of Kidneys.** *I hereby certify that the following is the result of a careful examination made by me of the applicant's urine:*

**A.** Specific Gravity, 1015. **B.** Reaction, Acid. **C.** Albumin, No. **D.** Sugar, No. **E.** Did applicant pass urine in your presence? Yes. **F.** Is the urine scanty or overabundant? Normal. Examination of urine is required in all cases. (See instructions.)

---

**18. Examination of a woman.** **A.** Has she passed the change of life? ........ **B.** Is her functional health regular? ........ **C.** How long has she been married? ........ **D.** How many children? ........ Age of last? ........ **E.** Is she pregnant? **F.** Do you suspect womb disease? **G.** Has she ever been treated for such? ........ If so, by whom? ........ **H.** Any disease of the breast? ........ **I.** Husband's occupation? **J.** If any miscarriages, when and how many? ........ ........

---

*Date,* Dec. 12, 1905. *Signature of Examiner,* W. B. KONKLE, *Address,* Montoursville, Pa.

Please read this paper over carefully before mailing it to the Medical Director, in order that all the questions may be fully answered, thus avoiding correspondence and delay. Forward immediately upon completion.

---

**TO THE EXAMINER:** No one, not even the agent, shall be present at this examination. The examiner should ask the applicant the questions (full answers required), and assist him to distinguish diseases from symptoms. "Childbirth," "Debility," "Exhaustion," "Overwork," "Exposure," "Dropsy," "Fever," etc., and especially "Don't Know," are answers which the company will not accept without explanation. The examiner must not be a near relative of the applicant, nor have any pecuniary interest in the policy applied for.

Where space does not fully permit answering questions, and for any additional information which you may wish to convey concerning the applicant, give full details on the reverse side of this application under head of "Examining Physician's Remarks."

The said statements and answers, as so set forth, are those which are referred to by the said C. E. Paulhamus as made to the company's medical examiner in the paper, a copy of which is given above in paragraph 4; but no copy of such statements or answers, or of the said medical examiner's report, was contained in or attached to the policy of insurance in suit or made to accompany the same.

(6) As stated by the said C. E. Paulhamus, in the papers set forth above in paragraph 4, the former occupation of said C. E. Paulhamus was that of painter and paper hanger, and his occupation or business at the time of taking out the policy was that of a real estate and insurance agent, although subsequent thereto he completed certain jobs or contracts for painting and paper hanging which he had previously agreed to do.

(7) On November 23, 1899, under the advice of his family physician, the said C. E. Paulhamus was taken to the Williamsport City Hospital to be operated upon, and was there operated upon, as he well understood, for hernia and for an undescended testicle, and in the course of and as the result of such operation it was found that the said undescended testicle was very much enlarged, weighing a pound and a quarter, was badly diseased, the veins being tortuous and vascular, and the said testicle having the appearance of being in a cancerous condition, but was not in fact cancerous. The said testicle was removed, and after remaining a month in said hospital the said C. E. Paulhamus was discharged therefrom and allowed to go to his home on December 24, 1899; but on January 12, 1900, he returned and complained of pain in his left side, and upon being examined hard lumps were there found, but no operation was undertaken, and he left the hospital again without having been operated upon.

(8) The amount due on the said policy, if it is a valid one, is $2,968.48 (being the amount of the policy, $3,000, less $31.52, the unpaid part of the first premium advanced to the insured, with interest at 3½ per cent. from December 16, 1905, to September 5, 1906), together with interest on the said sum of $2,968.48 from September 5, 1906, to this date, amounting to $243.41, making a total of $3,211.89.

If the court, on being further advised, shall be of opinion, from the facts so found, that the said policy of insurance is valid, and that the plaintiff is entitled to recover thereon, then we, the said jurors, find in favor of the plaintiff the aforesaid sum of $3,211.89; but if the court, on the other hand, is of opinion that by reason of anything which is so set forth above the plaintiff is not entitled to recover, then we find in favor of the defendant. Judgment to follow thereon in either case in accordance therewith, with costs.

Both plaintiff and defendant thereupon moved for judgment on the foregoing verdict.

James B. Krause and W. W. Champion, for plaintiff.
C. La Rue Munson, for defendant.

ARCHBALD, District Judge. This is an action to recover the amount claimed to be due on a policy of insurance taken out on his own life by C. E. Paulhamus with the defendant company in favor of the plaintiff, his wife, for $3,000. The jury at the suggestion of the court returned a special verdict, on which the case is now to be disposed of; both parties moving for judgment. The defendants rely, to defeat the policy, on certain statements, material to the risk, which appear in the report of the medical examiner, which were not true, although warranted by the insured to be so. The plaintiff contends that the defendants are not entitled to rely on the medical examiner's report, because it formed a part of the application and was not attached to the policy as required by the Pennsylvania statute. This is a Pennsylvania contract, and is governed in consequence by the law of the state as laid down by the decisions. McClain v. Provident Sav.

Life Assur. Soc., 110 Fed. 80, 49 C. C. A. 31. And the statements of the insured, having been warranted to be true, if they are material to the risk and not true in fact, the policy is invalid, unless the defendants, for the reason given, are barred from resorting to them. This result is not saved by section 1 of the Pennsylvania act of June 23, 1885 (P. L. 134), which provides that:

"Whenever the application for a policy of life insurance contains a clause of warranty of the truth of the answers therein contained, no misrepresentation or untrue statement in such application, made in good faith by the applicant, shall effect a forfeiture or be a ground of defense in any suit brought upon any policy of insurance issued upon the faith of such application, unless such misrepresentation or untrue statement relate to some matter material to the risk."

This act was passed to modify the rigor of the law, by which a representation or statement, whether material or not, and though made in good faith, if warranted to be true, avoided the policy, if not true in fact. But it leaves it still in force, where the representation or statement which is warranted is material and untrue, without regard to the ignorance or good faith of the party who warrants it. March v. Life Ins. Co., 186 Pa. 629, 40 Atl. 1100, 65 Am. St. Rep. 887; Lutz v. Life Ins. Co., 186 Pa. 527, 40 Atl. 1104; Penn Mutual Life Ins. Co. v. Mechanics' Sav. Bank, 72 Fed. 413, 19 C. C. A. 286, 38 L. R. A. 33.

There are four answers to questions in the medical examiner's report, which the jury have found to be material and at the same time untrue, which are relied on by the defendants to defeat the policy. The first of these was as to whether the insured had ever had hernia or been ruptured, to which he said, "No." The second was as to whether he had ever had cancer, or any tumor, abscess, or enlarged gland, which he answered in the same way. The third was whether he had had any illness, disease, or injury, other than those which he had previously mentioned, to which he replied, "None, except mild diseases of childhood." And the fourth whether he had ever been under treatment at any hospital, which he likewise negatived. The fact is, as found by the jury, that in November, 1899, some six years before the policy was issued, he had been operated upon at the Williamsport City Hospital for hernia and undescended testicle; it being disclosed by the operation, in which the testicle was removed, that it was very much enlarged and badly diseased, having the appearance of being in a cancerous condition, although not so in reality, and that, after remaining at the hospital, he was allowed to go home, but returned again in about three weeks, complaining of pain in his left side, where, on examination, hard lumps were found, but no further operation was undertaken. The jury have found that all the answers were made in good faith, which relieves the insured from any imputation that they were not. The charge of untruthfulness is also obviated, as to two of them, at least, by correct answers given to other questions directed to the same subject. Thus, in the application attached to the policy, in response to the inquiry whether he had had any serious illness or disease, except those incident to childhood, he stated that he had had an operation five years before for hernia, which was

a distinct affirmation of that fact, notwithstanding what he may have had to say about it afterwards, in reply to the somewhat ambiguous inquiry: "Have you hernia [that is, do you have it now], or have you ever been ruptured?" So, also, in the first part of the medical examiner's report, in response to the question, "How long since you were attended by a physician or consulted one professionally and for what disease?" he answered, "Five years, surgical case, operation for undescended testicle," which also gave notice of that particular feature of his ailment and the operation which he had undergone for it. It is true that he does not state that the operation was at a hospital, so as to correct or qualify his subsequent declaration that he had never been treated in one, thus possibly somewhat minimizing it. And it may be that, in the bare statement that he had been operated upon for the trouble specified, its serious character, and the badly diseased condition disclosed by it are similarly not indicated. But he gave the names of the physicians who attended him, by which this could have been followed up, and he certainly told enough to put the company upon inquiry. It is not to be expected that the answers of an applicant for insurance will be more than suggestive, particularly those made to and set down by a physician, who is supposed to be able to correct and interpret them; and the jury have found, in the present instance, that they were full and complete, as well as made in good faith, showing how they regarded them. It may be that in some respects they are inaccurate and open to criticism; but that they are misleading, or that the company was induced by them to accept a risk which they otherwise would not, is hardly to be credited. It is, therefore, difficult to see, taking them all in all, what real ground of complaint there is, or upon what basis it can be justly claimed that the policy should be forfeited.

But, assuming that, as the case stands, the answers are not all that could be desired, and are in fact contradictory and incomplete, if not, indeed, untruthful, amounting to a breach of warranty avoiding the policy, as charged by the defendants, it is contended by the plaintiff that the company is not in a position to take advantage of this; the misstatements of which complaint is made and on which a forfeiture is predicated being found among those taken down by the medical examiner, which, being a part of the application, as it is claimed, should have been attached to the policy in compliance with the local statute in order to give the company the benefit of them. The statute which is thus invoked is Act Pa. May 11, 1881, § 1 (P. L. 20), which provides that:

"All life and fire insurance policies upon the lives or property of persons within this commonwealth, whether issued by companies organized under the laws of this state, or by foreign companies doing business therein, which contain any reference to the application of the insured, or the constitution, by-laws or other rules of the company, either as forming part of the policy or contract between the parties thereto, or having any bearing on said contract, shall contain or have attached to said policies, correct copies of the application, as signed by the applicant, and the by-laws referred to; and unless so attached and accompanying the policy no such application, constitution or by-laws shall be received in evidence, in any controversy between the par-

ties to, or interested in, the said policy, nor shall such application or by-laws be considered a part of the policy or contract between such parties."

The question whether the act applies in the way contended for depends upon the circumstances. By the terms of the policy in controversy the statements and agreements in the application therefor are made a part of the contract, and it is also agreed in the paper signed by the insured, which is claimed by the company to be the real application in the case, that the statements and answers which there appear, and also those made to the company's medical examiner, "are warranted to be full, complete, and true, and are offered to the company as a consideration for the contract, which shall not take effect until this application has been accepted by the company at the executive office in Philadelphia, Pa., and the first premium has been paid," etc.; it being further declared in the same connection that:

"The agreements made in this application and contract applied for, taken together, shall constitute the entire contract between the parties."

The act of 1881 has been frequently before the courts, and, while there is no reported case which exactly corresponds with the one in hand, there are some which approach it closely, if, indeed, they do not in effect rule it. Thus, in Morris v. State Mutual Assur. Co., 183 Pa. 563, 39 Atl. 52, the medical examiner's report was not attached to the policy as a part of the application, and objection having been made to the right of the company to put it in evidence, in consequence, or to show the falsity of certain of its statements, it was rejected by the trial court, and the application attached to the policy, which had been offered by the plaintiff and inadvertently admitted, was also stricken out as not being complete without it, all of which was affirmed on error. It is true that the medical examiner's report in that case, differing from what we have here, was on the same sheet of paper as the application proper, which it followed; the questions in both being also consecutively numbered. The whole paper, furthermore, bore the same date, and was indorsed on the outside as the application of the insured; and, in order to take advantage of certain statements of the insured which appeared in the medical examiner's report, it was in effect conceded by the company in the affidavit of defense to be a part of the application. It was with regard to what so appeared, no doubt, that it was said by the Supreme Court:

"The whole paper is clearly the application, and was properly so construed."

In Baldi v. Metropolitan Ins. Co., 18 Pa. Super. Ct. 599, the paper in question was also a single sheet, divided into three parts, which were severally designated as:

"(A) Application to the Metropolitan Life Insurance Company." "(B) Statements made to the Medical Examiner," and "(C) Medical Examination and Report."

The two parts, A and B, were signed by the insured, but not the part C, opposite to the caption of which were also the words, "No part of the declaration of the applicant." The court below held that C, equally with A and B, was a part of the application, and was there-

fore bound to have been copied into or attached to the policy, in order to be available to the company. In reversing this, on error taken, it was said:

"Considerable stress is laid upon the fact that the clause of the policy relative to the answers and statements contained in the printed and written application is not expressly limited to the answers and statements contained in A and B. This is true; but it does not answer the question for decision, namely, what is the application? This question is to be determined by an inspection of the paper itself. Examining it more critically, we find that part A was signed on January 19, 1895, by the applicant, and contains this clause: 'It is hereby declared and warranted by the undersigned that the answers and statements contained in the foregoing application and those made to the medical examiner, as recorded in parts A and B of this sheet, together with this declaration, shall be the basis and become part of the contract of insurance with the Metropolitan Life Insurance Company; that they are full and true, and are correctly recorded; and that no information or statement not contained in this application' (evidently referring to part A) 'and in the statements made to the medical examiner' (evidently referring to part B) 'received or acquired at any time by any person shall be binding upon the company, or shall modify or alter the declarations and warranties made therein.' Referring, now, to part B, we find that it is headed, 'Statements Made to the Medical Examiner by Francis Rizzo, M. D., in Connection with Application on Reverse of This Sheet.' It is thus made a part of the application. Construing these two parts as a connected whole, we find conclusive evidence as to what answers and statements were intended to be made warranties and part of the contract. They are the answers and statements recorded in parts A and B. These were signed by the applicant. Part C was not. The latter bears date two days after A and B were signed, and for aught that appears in this case may never have been seen by the applicant. The medical examiner was not his agent, but was selected by the company. His declarations, although indorsed on the paper itself, could not be offered in evidence against the plaintiff, in the absence of extrinsic evidence that they were authorized or assented to by him. To remove all doubt upon this point it was expressly noted at the head of part C that it was 'no part of the declaration of the applicant.' This operated to the benefit of the insurer, as well as the insured. By no process of reasoning can it be held that the latter warranted the truth of the answers and statements of the medical examiner contained in part C. It seems to us equally clear that the former [the insurer], in its effort to comply with the provisions of the act of 1881, was justified in treating part C as not part of the application."

This case bears on the one in hand, not so much in what it decides as in what it recognizes. All that it expressly rules is that the part designated as C was not carried into the application, although on the same sheet with it, so as to be required to be copied in or attached to the policy. The rest, no doubt, is obiter, but of a convincing character. It accepts without question that, under practically the same circumstances as we have here, the statements made to the medical examiner are equally a part of the application with that which is in terms so designated, both, by direct reference, being made the basis of the contract of insurance and the statements contained in them being included in the same warranty. The only possible distinction to be observed is that in that case both bore the same date and were on the same sheet of paper, where here they are a day apart and physically separate.

In Fisher v. Life Association, 188 Pa. 1, 41 Atl. 467, it does not appear whether the two papers were separate; but the statements made to the medical examiner were declared by the caption to be supplemental to and a part of the application, and, having been omitted from

the policy, the application, which there appeared, was rejected as incomplete, and so inadmissible.

In Nugent v. Greenfield Life Association, 172 Mass. 278, 52 N. E. 440, under a similar statute, the statements made to the medical examiner by the insured and signed by him were recognized, the same as in the Baldi Case, as forming a part of the application, while the report of the medical examiner to the company was not; the two papers so accepted as forming the application being physically separate, the same as here.

So in Dimick v. Metropolitan Life Ins. Co., 69 N. J. Law, 384, 55 Atl. 291, 62 L. R. A. 774, and Holden v. Same, 11 App. Div. 426, 42 N. Y. Supp. 310, the policy having made the answers and statements contained in the application a part of the contract and declared them to be warranties, and the question arising as to what constituted the application, it was held that the statements made to the company's medical examiner, signed by the applicant, and, with the answers in the application proper, declared to be the basis of the contract, the company having been guided thereby in accepting the risk and issuing the policy, were to be taken as forming a part of the application, and so binding upon the insured by virtue of his warranty. And if this is the case as respects the insured, it is difficult to see why it should not equally be the case, the positions being reversed, as respects the company.

Assuming, however, for the sake of argument, that there is nothing in the cases cited which directly rules the one in hand, independent of authority, if that be wanting, it is clear upon principle that the statements made by the insured to the medical examiner formed a part of the application within the meaning of the statute. The evident purpose of the requirement that a copy of the application shall be contained in or attached to the policy is to disclose to the insured the representations and statements with which he is charged, affecting the risk, on which the company has relied in accepting his application and issuing a policy, and which will have to be met in any controversy over it. It is important, therefore, as it certainly was intended, that, entering into and forming a part of the contract by virtue of his warranty and the terms of the policy, as his statements in that connection do, everything of which this can be predicated shall be there set forth. "It is well known," says Mitchell, J., in Lennox v. Insurance Co., 165 Pa. 575, 30 Atl. 940, "that the evil aimed at in this legislation was the custom of insurance companies to put in their blank forms of application long and intricate questions or statements to be answered by the applicant, usually in very small type, and the relevancy or materiality not always apparent to the inexperienced, and therefore liable to become traps to catch even the innocent unwary. The general intent was to keep these statements before the eyes of the insured, so that he might know his contract and, if it contained errors, have them rectified before it became too late."

In the case at bar, by the terms of the policy the application is made a part of the contract, and the statements and agreements therein contained are declared to enter into the consideration. It is also

agreed by the applicant at the foot of the first part of the application that the statements and answers which he there makes, as well as those made to the company's medical examiner, are warranted to be full, complete, and true, and are offered to the company as a consideration for the contract of insurance applied for. The statements made by the applicant himself direct, as well as those made to and set down by the company's medical examiner, are thus linked together, and go before the company as the basis of the policy to be issued. If they were on different halves of the same sheet, and bore the same date, it would be practically impossible to distinguish the case from that of Morris v. Insurance Co., 183 Pa. 563, 39 Atl. 52; the further circumstance that the two were run together there by a serial numbering of the questions being immaterial. But the difference here in date is but a day, one being dated December 11th and the other December 12th, making them substantially the same; and the fact that they are physically detached and appear on two separate pieces of paper is of little consequence when the purpose and use to be made of them are considered. Both are signed by the applicant, thus to that extent fulfilling the requirement of the statute; and both by the terms of the warranty are made a part of the contract in case the application is accepted and a policy issued. Both being thus put on a par, and being of equal importance to the insured, as well as to the company, it does violence to them to separate them, and to assert that one of them is the application of the insured and the other forms no part of it. It is of some significance, also, that in the directions given by the company on the margin of the medical examiner's report it is said, "For any additional information which you may wish to convey concerning the applicant, give full details on the reverse side of *this application*," and that, on the reverse of the same sheet, under the head of "Family Physician's Certificate," the first question is; "How long have you known the party whose life is proposed for insurance in the *foregoing application*?"—the company thus unmistakably indicating on the face of the paper the idea which they had of it. But without dwelling upon that, and independently of it, the statements made by the insured to the medical examiner, as well as those which he himself set down, both being signed by him and warranted to be true, and both by his direct authority and sanction thus going in to the company as the basis of the insurance applied for, are to be taken as together constituting the application on which the risk was accepted and the policy issued, and were therefore required by the statute to be indorsed on or attached to it, the one as much as the other; which not having been done, the company is not entitled to take advantage of anything which appears in either of them.

It is said, however, that the medical examiner's report was offered in evidence by the plaintiff, and that, having been brought into the case in that way, the defendants are entitled to make use of it for any relevant purpose. But the case is now before the court on a motion for judgment on the verdict, and we are not concerned, therefore, with how the medical examiner's report got in, but only with the legal effect to be given to it under the facts reported. If any inquiry, moreover, of this kind, were open to be entered upon, a re-

sort to the record would show that this report was only offered after the court, against the objection of the plaintiff, had required the incomplete application attached to the policy to be offered along with that instrument, thereby opening the door for the evidence which fol-lowed with regard to the untruthfulness of certain statements contained in it, to counteract which the plaintiff was compelled to put in the medical examiner's report, which the defendants at once took advantage of, all of which, however, before the case closed, the plaintiff moved to strike out as irrelevant and inadmissible, which should have been granted, according to the view now taken.  Upon any such inquiry, therefore, the advantage would not lie with the defendants, and, on the contrary, it would merely serve to show that, had the case been tried by the court as it should have been, it would have stopped with the prima facie case made out by the policy, the proofs of death, and the evidence of nonpayment, upon which a verdict would have had to be directed for the plaintiff.  But, as already stated, the jury having found the material facts, the only question at this time is the judgment to be entered on them.  The mere circumstance that the medical examiner's report is returned among them does not determine the use that can be made of or the effect that can be given to it; the competency of it, as a matter of law, to affect the policy, having been by no means thereby conceded.  Prov. Sav. Life Assur. Soc. v. Beyer, 67 S. W. 827, 23 Ky. Law Rep. 2460; Pitcairn v. Hiss, 125 Fed. 110, 61 C. C. A. 657.  This is to be decided by all the facts found by the jury, and it appearing therefrom that, in disregard of the statute, a copy of the medical examiner's report, forming a part of the application, was not attached to the policy, the statements of the insured therein contained are not to be considered as entering into the contract of insurance, nor can they or those of the so-called application, indorsed on the policy, be resorted to by the company to make out the breach of warranty which is relied on.

Judgment is therefore directed to be entered on the verdict in favor of the plaintiff in the sum of $3,211.89, with interest from January 16, 1908, and costs.