# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

### STRACHAN SHIPPING CO. v. GULF STATES STEEL CO.

(Circuit Court of Appeals, Fifth Circuit. October 18, 1920. Rehearing Denied November 8, 1920.)

No. 3569.

Shipping ☞153—Evidence held insufficient to show shipper agreed to pay increased rate required by shipping permit.

Evidence that a shipper, who had a contract with a shipping agent which specified the freight, had informed the agent with reference to a prior contract that it had an arrangement with a foreign government for shipment at the contract rate, under which it could recover any excess it was required to pay, but that, with reference to the contract in controversy, it had insisted on holding the shipping agent to the contract rate, *held* insufficient to show that the contract had been modified, so as to require the shipper to pay the increased rate necessary to obtain from the foreign government a permit for the shipment.

Appeal from the District Court of the United States for the Southern District of Georgia; Beverly D. Evans, Judge.

Libel by the Gulf States Steel Company against the Strachan Shipping Company. Decree for libelant, and respondent appeals. Affirmed.

Samuel B. Adams and A. Pratt Adams, both of Savannah, Ga., for appellant.

A. R. Lawton, Jr., of Savannah, Ga., for appellee.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge. On November 9, 1916, the appellant, Strachan Shipping Company, agreed in writing, subject to conditions stated, to furnish to the appellee, Gulf States Steel Company, freight room for 1,000 tons of steel billets—

"per steamship May shipment * * * from Savannah to Liverpool or Manchester * * * at the rate of eleven dollars ($11.00) per ton of 2,240 lbs. Freight prepaid."

---

In July, 1918, after 800 of the 1,000 tons of billets called for by the contract had been shipped in three parcels going by different vessels, the balance of 200 tons was shipped by the appellant on the British steamship Kaduna, pursuant to a permit procured by the appellant from the British Ministry of Shipping, which fixed a freight rate considerably higher than the one stated in the contract. Upon the appellant declining to deliver to the appellee the bills of lading for the billets so shipped, unless the former was paid the amount of freight it had paid on the shipment, the latter paid such amount under protest, and filed its libel to recover the amount of the difference between the sum so paid and the contract rate. The decree appealed from sustained the claim asserted by the libel.

In behalf of the appellant no claim is made that the contract has been canceled, or in any way has ceased altogether to be binding upon it. The evidence adduced does not leave it open to dispute, and it is not disputed, that the contract was modified in respect of the time when the freight space was to be furnished; the appellee acquiescing in the postponement of shipments beyond the month of May, 1917. For the appellant it is contended that the contract was modified in respect of the freight rate also, and that the appellee consented to pay more than the rate stated in the contract if, because of conditions resulting from the existence of war, the appellant had to pay more to obtain the freight space required. There was no express modification of the contract in the last-mentioned respect. There was no evidence that the appellee consented to pay more than the contract freight rate, unless it is found in correspondence now to be mentioned.

On January 19, 1917, the appellant wrote to the appellee a letter which, after referring specifically to contracts covering 4,000 tons of steel billets for January and February shipment, 2,000 tons each month, and mentioning the fact that the owners of steamers chartered to carry the steel mentioned had advised appellant that they were unable to get licenses, except on condition that two-thirds of the cargo carried be government goods of a kind that made it impossible to complete the cargoes with any commodity heavier than cotton, concluded with the following statement:

"We feel under these conditions that we would be justified in canceling all bookings as provided for in requisition and war clauses of contract, but beg to assure you that such is not our desire, and that we intend to continue our efforts to supply tonnage to cover all contracts with you at earliest possible date, although we feel that it is important, and indeed necessary, that we frankly advise you of the situation, in order that you may advise and explain to your buyers that there will be almost certain delay in forwarding parcels mentioned."

On the same day Mr. Armstrong, a director and vice president of the appellant, wrote a personal letter to Mr. Knight, appellee's traffic manager, which, after referring to the letter just quoted from, and mentioning the fact that requisitioning by the British government of much of the space in British steamers then being chartered in this country made it uncertain when space could be obtained for appellee's steel, said:

"I wish to suggest to you privately that, in my opinion, something might be accomplished by writing or cabling Admiralty to provide space to take care of your sales contracts."

The appellee complied with this suggestion, and so notified the appellant by a letter dated January 22, 1917. On January 24, 1917, appellee sent to appellant the following telegram:

"Our London agents Sanders Brothers and Company cable following Grantley Ethclanic parcels thanks to recommendations by ministry of munitions the oversea transport department New York superintendent gets cable instructions to arrange space if not by above vessels then by earliest possible opportunities at freight contract rate with undersanding if vessel claims market rate you pay same as department will issue us certificate enabling refund this end stop. Understand Grantley due Savannah shortly please indicate what tonnage she will lift so we will know what documents necessary to send to you."

As shown by the correspondence which preceded it, that telegram related to freight space for 4,000 tons of billets, 2,000 for January and 2,000 for February shipment. As to those shipments it cannot be said that it plainly showed that appellee consented to pay appellant freight at a higher rate than that contracted for. Certainly the act of the appellee in communicating to the appellant the contents of that telegram did not amount to a representation that the refunding privilege mentioned had been granted as to future shipments other than those specifically dealt with, and for an indefinite time, and did not indicate appellee's consent to pay more than the contract rate on future shipments other than those to which the correspondence referred.

For considerably more than a year following the date of that telegram, and before the shipment now in question was made, there were correspondence and dealings between the parties in reference to the several shipments contracted for. Nothing in such subsequent correspondence or dealings indicated that the parties concurred in construing the above set out telegram as evidencing a consent by the appellee to pay freight at a higher rate than that contracted for, either on the shipments under the contracts for January and February, or on a shipment under the contract now in question. It was not shown that the appellee paid more than the contract rate on any of the shipments made prior to the one now in question, all of which were made under permits obtained by the appellant for the use of space on requisitioned British vessels. The contract rate was charged and paid on the three preceding shipments of parts of the 1,000 tons of billets called for by the contract for May shipments. The facts just stated indicate the absence of anything in the dealings between the parties with reference to previous shipments upon which to base a claim by the appellant that the appellee had estopped itself to insist on the freight rate stated in the contract under which the shipment now in question was made.

The information that the permit under which the 200-ton shipment now in question was made called for a freight rate higher than the one named in the contract was imparted to the appellee in a letter of the appellant dated June 6, 1918. The letter of the appellee to appellant, dated June 18, 1918, accompanying the railroad bills of lading for the 200 tons of billets comprised in that shipment, specifically called

attention to the fact that the ocean freight rate stated in the contract was $11 per ton. A letter of the appellant to appellee, dated June 19, 1918, contained the following:

"We carefully note all that you write, and in reference to the freight, we observe you mention that same should be calculated at $11.00 per ton, completing our contract 273. This movement is now covered by permit No. 9118 issued by the British Ministry of Shipping, New York, which shows a rate of 82/6, freight to be prepaid, and we, of course, must be, guided entirely by this permit. Kindly, therefore, take note of this difference, and oblige."

The following is a copy of a letter of appellee to appellant, dated June 24, 1918, omitting address and signature:

"Referring to your favor of the 19th instant, file 40619, concerning steel for Bayliss, Jones & Bayliss, we do not understand that the permit issued by the British Ministry of Shipping in any way affects the rate of freight as that is covered by your contract. Of course, if you do not intend to protect your contract, we would like to have some expression from you on the subject."

That correspondence occurred before the 200 tons of billets were delivered to the vessel in pursuance of the permit. Before the shipment was actually made, appellant did not make it known to appellee that the former would not abide by the provision of the contract on the subject of the rate of freight to be paid by appellee. The circumstances attending the shipment negative the conclusion that the appellee estopped itself to hold the appellant to the contract so far as the freight rate was concerned.

The conclusion is that the evidence adduced does not show that there was a meeting of the minds of the parties on the subject of a modification of the contract in respect of its provision stating the rate of freight to be charged, and that it did not show that appellee, by estoppel or otherwise, lost the right to have the shipment in question made by appellant at the contract freight rate.

It follows that the decree appealed from should be, and it is, affirmed.