68 N.J. Super. 93 (1961)
172 A.2d 30
LIFE INSURANCE COMPANY OF NORTH AMERICA, A CORPORATION OF THE STATE OF PENNSYLVANIA, PLAINTIFF,
v.
JOSEPHINE B. DE CHIARO, INDIVIDUALLY AND AS EXECUTRIX OF THE LAST WILL AND TESTAMENT OF FRANK JOHN DE CHIARO, DECEASED, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided May 25, 1961.
*94 Mr. Charles Danzig for plaintiff (Messrs. Riker, Danzig, Marsh & Scherer, attorneys; Mr. Ronald M. Sturtz, on the brief).
Mr. Bernard Shurkin for defendant.
MINTZ, J.S.C.
Plaintiff brings this action for the cancellation of a receipt which it issued in connection with an application for life insurance filed by Frank John De Chiaro (herein referred to as decedent), and to require his widow, the defendant, to accept $19.50, the consideration paid by the decedent on account of the premium when he made the application, and received the receipt. She counterclaims for the face amount of the insurance policy applied for ($25,000), asserting that the receipt is a contract of interim insurance. Cross-motions for summary judgment have been made.
Plaintiff's soliciting agent, Vernon S. Taylor, Jr., and Robert L. Jackson, assistant manager of the Newark Office, together called upon decedent to sell him insurance. Following this visit decedent submitted to a medical examination and furnished a medical history to Dr. Dean C. Shore of Morristown, the local examining physician selected by plaintiff and unknown to decedent. The medical information was incorporated in Parts II and III of decedent's application for insurance which was filled out by Dr. Shore on June 2, 1959, the date of the examination.
On June 4 Mr. Taylor again visited decedent at which time Part I of the application for insurance was completed, signed by decedent and witnessed by Mr. Taylor. The application stated in part:
"(4) if no premium is paid with this application, no insurance shall become effective unless and until a policy is issued and delivered to the Applicant, and the first premium thereon is paid while all persons on whom insurance is requested are in good health, and the information in Part I, * * * and * * * Part II hereof remains unchanged; (5) if premium payment is made with this application, insurance shall become effective only as provided in the Receipt bearing the same number as this application; (6) no contract *95 of the Company can be made, modified or discharged, nor can any of its rights or requirements be waived, except in writing signed by its President, Vice President, Secretary or Assistant Secretary; * * *."
Upon signing Part I of the application decedent paid Mr. Taylor $19.50, one-twelfth the annual premium due on the policy applied for. He received the following receipt:
"IF PAYMENT IS MADE WITH APPLICATION, THIS RECEIPT MUST BE COMPLETED AND GIVEN TO THE APPLICANT. OTHERWISE IT MUST NOT BE DETACHED.
NO. L 74543 RECEIPT FOR PAYMENT OF PREMIUM WITH APPLICATION
Received from Frank B. De Chiaro, Applicant to Life Insurance Company of North America for insurance as applied for on an application bearing the same number as this receipt, the sum of $19.50 on account of the first premium, upon the following conditions:
If the sum paid with respect to any policy applied for in the application bearing the same number as this receipt, as stated in such application, is at least one-twelfth (1/12) of an annual premium on such policy but not less than $10.00: (a) insurance under the terms of such policy but, in the case of a Life Insurance Policy, not in excess of $100,000, shall take effect from the date of application, if the Company at its Home Office shall be satisfied that on that date the Proposed Insured, and his wife and all dependent children, if family insurance is requested, and the Applicant, if Payor Insurance is requested, was or were insurable at standard rates under its rules and practices, and shall approve without modification insurance for the amount, and on the plan, applied for; (b) if the sum paid is less than the first premium for the payment period selected, the remainder of the first premium may be paid within sixty days from this date, without further evidence of insurability, but subject to approval of the application as above; but (c) if any such balance is not paid, any insurance becoming effective shall terminate after that fraction of such payment period, which is equal to the fraction of the premium for that period represented by the sum paid.
If the application is declined, or if it does not receive the Company's approval within sixty days of its completion, no insurance will have been effected and the amount paid will be returned.
Dated at Morristown, N.J. this 4th day of June 1959.
Vernon S. Taylor, Jr., Agent
THE COMPANY WILL RECOGNIZE NO OTHER RECEIPT THAN THIS BEARING THE SAME NUMBER AS THE APPLICATION."
*96 On June 8, 1959 Mr. De Chiaro suffered a rupture of a congenital aneurysm and was hospitalized. The following day plaintiff was advised by Retail Credit Company of Morristown, doing a report for it on Mr. De Chiaro, that he had died from a heart attack. The underwriter's work sheet used by Donald S. Vincent, Chief Underwriter for plaintiff, in evaluating Mr. De Chiaro's application for insurance, has on its face the following notation:
"6-9-59 D S V  Mgr. R C C
Morristown advised me by phone that this applicant had a coronary and died this A.M. BLB"
Immediately below is written:
"Decline  not acceptable on std. Basis as applied for. Refund prepayment /DSV
 6-9-59"
In the space entitled "Underwriting Action": is written:
"Declined
 DSV
 6-9-59/HWC"
The initials DSV and HWC are those of Mr. Vincent and Mr. Henry W. Cook, Jr., Vice President of the plaintiff company. On the right bottom of this work sheet in the space designated "Report Codes" are figures which apparently refer to blood pressure recordings. These entries are dated June 13, 1959, so that presumably the data pertaining to Mr. De Chiaro's eligibility for insurance was still being reviewed by the plaintiff on that date. On June 10, 1959 the Home Office received word from the Credit Company that Mr. De Chiaro was stricken but had not died. On June 11, Vice President Cook of the Philadelphia Home Office wrote to the Newark Office acknowledging receipt of Mr. De Chiaro's application, which he declined.
On June 16, 1959 Mr. De Chiaro died. On that same evening at about 10:00 P.M. Mr. Taylor visited the defendant's *97 home in Morristown for the purpose of returning the $19.50 premium paid by her late husband. She was not at home. He returned the following morning and advised defendant that his company had rejected her husband's application. He tendered her a check for the premium which she refused. On July 9, 1959 Mr. Cook wrote a letter directed to the Estate of Frank J. De Chiaro, in which he stated that no insurance had been effected. An enclosed check for the premium payable to decedent's estate was refused.
Plaintiff urges that the terms of the receipt are clear and unambiguous, and plainly state that no insurance will be effected until the company approves the application; that it never approved the application and, further, that Mr. De Chiaro could not have qualified for the standard policy he applied for because his weight and blood pressure exceeded the norms then established by the plaintiff for men of his age and build. His application was for a policy in the face amount of $25,000 with accidental death benefit and waiver of premium provisions.
The plaintiff's underwriting manual was not printed in final form until July 1959. While it was being prepared the underwriting staff, in evaluating applications for insurance, used portions of underwriting manuals of other insurance companies which the company regarded as acceptable. At the time in question, the staff used the blood pressure chart and related underwriting rules and practices of Connecticut General Life Insurance Company, and the "Build Chart" and "loss in weight" underwriting rules and practices of the Lincoln National Life Insurance Company (the build chart being identical to the one finally adopted in plaintiff's own underwriting manual).
Defendant submitted a physician's affidavit to the effect that he had examined Parts II and III of decedent's application, the urinalysis report, and the autopsy report. He noted that decedent died of a ruptured aneurysm which was asymptomatic and which led to his death eight days after *98 the onset of a subarachnoid hemorrhage. In his opinion Mr. De Chiaro had neither high blood pressure nor hypertension and was in sound health from June 2, 1959 until June 8, 1959. Be that as it may, from the plaintiff company's view, which is controlling, the decedent did not qualify for the issuance of a standard rate policy of insurance on the plan applied for. However, decedent was insurable on a rated basis. Although he was not eligible for a waiver of premium clause, an accidental death provision was available at an increased premium.
The primary issue is a determination of the legal effect of the receipt. Unless it constitutes a contract of interim insurance, plaintiff is entitled to judgment. The use of life insurance receipts, sometimes referred to as binding receipts or interim insurance, has been the source of much litigation. "But nearly a century of litigation between beneficiary and insurer has developed more confusion than regulation." 63 Yale L.J. 523, 525 (1954). See also 60 Harv. L. Rev. 1164 (1947) and the exhaustive annotation in 2 A.L.R.2d 943 (1948).
Insurance Co. v. Young's Adm'r, 23 Wall. 85, 90 U.S. 85, 23 L.Ed. 152 (1875) is an oft-cited authority for denying recovery on a life insurance receipt. In that case the company issued a binder, rejected the application and sent a different policy to the applicant prior to his fatal injury. The applicant did not accept the policy offered prior to death. The court held decedent's application had been rejected and the counter-offer not accepted, hence no contract. One cannot quarrel with this decision, since the application was clearly rejected by the company in the lifetime of the applicant who never accepted a substitute policy. The decision does not purport to consider the effect of death or intervening terminal illness prior to the company's rejection.
Gaunt v. John Hancock Mutual Life Ins. Co., 160 F.2d 599 (2 Cir. 1947) (L. Hand, J.), certiorari denied 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (1947), where the court found interim insurance, is a leading authority *99 exemplifying the modern trend to hold receipts similar to the one in issue here ambiguous and resolve the ambiguity against the insurer. There the pertinent part of the application read as follows:
"If the first premium or installment thereof above stated was paid when this application was signed, and if the Company is satisfied that on the date of the completion of part B of this application I was insurable in accordance with the Company's rules for the amount and on the plan applied for without modification, and if this application, including said Part B, is, prior to my death, approved by the Company at its Home Office, the insurance applied for shall be in force as of the date of completion of said Part B, but, if this application so provides, such insurance shall be in force as of the date of issue of the policy."
Gaunt signed the application and paid the full first premium. The agent took him to the defendant's local examining physician who found him insurable under the rules and recommended his acceptance. The Home Office medical department likewise approved Gaunt but sought further information pertaining to his 4F draft status. Gaunt was found shot to death, and the Home Office had never finally approved the application although the trial judge found that if Gaunt had lived, it would have done so. Judge Learned Hand in the course of his opinion held, at pp. 601-602:
"* * * the question becomes whether the words: `if the application, including Part B, is prior to my death, approved by the Company, at its Home Office,' must inescapably be read as a condition precedent upon the immediately following promise: `the insurance * * * shall be in force as of the date of the completion of Part B.' It is true that if the clause as a whole be read literally, the insured was not covered if he died after `completion of part B,' but before `approval'; and indeed he could not have been because there must always be an insurable interest when the insurance takes effect. Yet what meaning can be given to the words `as of the date of the completion of Part B' if that be true? The defendant suggests six possible `advantages' to the insured which will satisfy the phrase, `the insurance * * * will be in force,' (1) The policy would sooner become incontestable. (2) It would earlier reach maturity, with a corresponding acceleration of dividends *100 and cash surrender. (3) It would cover the period after `approval' and before `issue.' (4) If the insured became uninsurable between `completion' and `approval' it would still cover the risk. (5) If the insured's birthday was between `completion' and `approval', the premium would be computed at a lower rate. (6) When the policy covers disability, the coverage dates from `completion'. An underwriter might so understand the phrase, when read in its context, but the application was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts; and not one in a hundred would suppose that he would be covered, not `as of the date of completion of Part B,' as the defendant promised, but only as of the date of approval. Had that been what the defendant meant, certainly it was easy to say so; and had it in addition meant to make the policy retroactive for some purposes, certainly it was easy to say that too. To demand that persons wholly unfamiliar with insurance shall spell all this out in the very teeth of the language used, is unpardonable. It does indeed some violence to the words not to make actual `approval' always a condition, and to substitute a prospective approval, however inevitable, when the insured has died before approval. But it does greater violence to make the insurance `in force' only from the date of `approval'; for the ordinary applicant who has paid his first premium and has successfully passed his physical examination, would not by the remotest chance understand the clause as leaving him uncovered until the insurer at its leisure approved the risk; he would assume that he was getting immediate coverage for his money. This is confirmed by the alternatives presented in the twelfth question; the insurance was to be `effective,' either when the policy issued, or at the `date of Part B'; there was not an inkling of any other date for the inception of the risk. It is true that in Connecticut as elsewhere the business of writing life insurance is not colored with a public interest; yet in that state, again as elsewhere, the canon contra proferentem is more rigorously applied in insurance that in other contracts, in recognition of the difference between the parties in their acquaintance with the subject matter. A man must indeed read what he signs, and he is charged, if he does not; but insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion. We can think of few situations where that canon is more appropriate than in such a case as this."
Gaunt is distinguishable for there the insurer's local examining physician found the applicant insurable under the company rules and recommended him for acceptance. Nevertheless, the rationale in Gaunt is apposite. In several subsequent *101 decisions the ruling in Gaunt was applied to hold the insurer liable although it was urged that the receipt holder was not insurable on the plan applied for.
In Ransom v. Penn Mutual Life Ins. Co., 43 Cal.2d 420, 274 P.2d 633 (Sup. Ct. 1954) the insurer urged that the applicant Ransom who had paid his first premium was not insurable on the plan applied for because of blood pressure readings. Ransom, upon being examined by the insurer's physician (who found nothing wrong) in September 1949 disclosed that he had previously been examined by a Dr. Long. In response to inquiry Dr. Long furnished a medical history. After receiving this report, defendant requested Ransom to submit to a further medical examination but before this could be arranged Ransom was killed in an automobile accident. Defendant, learning of Ransom's death, tendered plaintiff the full amount of the first premium payment and informed her that, in view of Dr. Long's report, Ransom's application could not be approved. The court there indicated that in several jurisdictions under similar circumstances it was held that no contract of insurance exists until the insurer has been satisfied as to the applicant's acceptability, and that the provision that the insurance shall be in force from the date of the application means that, if and when the company is satisfied, the contract shall be considered to relate back and take effect as of that date. In other jurisdictions this provision gives rise to a contract of insurance immediately upon receipt of the application and payment of premium, and the proviso concerning acceptability creates only a right to terminate the contract if the company becomes dissatisfied with the risk before a policy is issued. The court accepted the latter view holding, at 274 P.2d 635-636:
"We are of the view that a contract of insurance arose upon defendant's receipt of the completed application and the first premium payment. The clause quoted above is subject to the interpretation that the applicant is offered a choice of either paying his first premium when he signs the application, in which event `the insurance *102 shall be in force * * * from the date * * * of the application,' or of paying upon receipt of the policy, in which event `no insurance shall be in force until * * * the policy is delivered.' The understanding of an ordinary person is the standard which must be used in construing the contract, and such a person upon reading the application would believe that he would secure the benefit of immediate coverage by paying the premium in advance of delivery of the policy. There is an obvious advantage to the company in obtaining payment of the premium when the application is made, and it would be unconscionable to permit the company, after using language to induce payment of the premium at that time, to escape the obligation which an ordinary applicant would reasonably believe had been undertaken by the insurer. Moreover, defendant drafted the clause, and had it wished to make clear that its satisfaction was a condition precedent to a contract, it could easily have done so by using unequivocal terms. While some of the language tends to support the company's position, it does no more than produce an ambiguity, and the ambiguity must be resolved against defendant. (Civ. Code, § 1654; see cases collected in 14 Cal. Jur. 443-446.)
Defendant argues that because of the blood pressure readings reported by Dr. Long, Ransom was unacceptable under company rules for the particular insurance plan applied for. As we have seen, however, a contract for the insurance coverage described in the application came into existence upon receipt of the application and the premium payment after Ransom had been examined by defendant's doctor. The contract was not terminated by the request for further medical examination. The request indicated that no final decision had as yet been reached as to whether Ransom was an acceptable risk on the plan applied for. We need not decide, therefore, whether, as suggested by some courts, such a contract can be terminated only by actual rejection of the application and return of the premium payment. See Reynolds v. Northwestern Mut. Life Ins. Co., 189 Iowa 76, 176 N.W. 207, 209; Colorado Life Co. v. Teague, Tex. Civ. App., 117 S.W.2d 849, 854; Reck v. Prudential Ins. Co. of America, 116 N.J.L. 444, 184 A. 777, 778."
In Liberty National Life Ins. Co. v. Hamilton, 237 F.2d 235 (6 Cir. 1956), the Tennessee law was under consideration. On February 28, 1954, one Hamilton applied for insurance, paid the first premium and received a receipt. On March 4, 1954 he was examined by the insurer's doctor to whom he gave a medical history of two prior hospitalizations. While the company was seeking further information pertaining to the ailments he had disclosed, he suffered *103 a coronary occlusion and died. The court said, at pp. 237, 240:
"* * * In those cases where liability has been imposed in comparable cases two principles have been relied upon: 1) that where there are conflicting or ambiguous recitals as to the time when the insurance becomes effective, the conflict is resolved against the insurer and 2) that considerations of public policy make it fundamentally unfair for an insurer to collect a premium while providing no coverage for the period reserved by the insurer to consider and act upon the application.

* * * * * * * *
We do not ignore the provision that approval is conditioned upon the applicant being in good health at the time and a risk acceptable to the company under its rules, limits and standards. There was, however, substantial lay and medical evidence that Hamilton was in good health at the time of his medical examination. While there was conflict, it presented a question of fact for the jury which it was its province alone to answer. We attach no importance to the requirement that the risk be acceptable to the company under its rules, limits and standards where the record fails to show that Hamilton had knowledge of company standards when he signed the application and paid his premium. The Court submitted to the jury the question whether Hamilton's medical examination had been completed so as to make the coverage effective on that date. A careful reading of the record and the reports of the examining physician indicates that there were no further physical tests they desired to make.
There is respectable authority for the proposition that where a premium has been paid there is insurance coverage, regardless of other stipulations in the application or receipt. * * * [T]hat is the purport of Judge Clark's concurring opinion in the Gaunt case." (Citations omitted)
See McAvoy Vitrified Brick Co. v. North American Life Assur. Co., 395 Pa. 75, 149 A.2d 42 (Sup. Ct. 1959); American Nat'l. Ins. Co. v. Thompson, 44 Tenn. App. 627, 316 S.W.2d 52 (Ct. App. 1957) certiorari denied by Tenn. Sup. Ct. 1958. Cf. Union Life Ins. Co. v. Rhinehart, 229 Ark. 388, 315 S.W.2d 920 (Sup. Ct. 1958); Western & Southern Life Ins. Co. v. Vale, 213 Ind. 601, 12 N.E.2d 350 (Sup. Ct. 1938). Going beyond these cases in refusing to recognize insurability as a condition precedent to the existence of interim insurance is Metropolitan *104 Life Ins. Co. v. Grant, 268 F.2d 307 (9 Cir. 1959) where the applicant died after paying his first premium but before he could undergo a medical examination. The court applied California law, followed Ransom, supra, and found interim insurance in effect. In spite of the fact that the wording of the receipt in Ransom differed from that given to Grant, the court refused to make any distinction predicated on differences in terminology and found that the same ambiguity was present. It further stated, at p. 310:
"The set up in the application reasonably presents a picture to an applicant that two stages are present. First pay the portion of the premium required in advance and in consideration thereof you will have protection until your application is accepted or rejected. Second, if appellant accepts the risk a policy will be issued in due course."
Cf. Johnson v. Equitable Life Assur. Soc. of United States, 275 F.2d 315 (7 Cir. 1960).
Other cases where receipts were construed to provide interim insurance and permit recovery include Speronza v. Phoenix Mut. Life Ins. Co. of Hartford, 272 App. Div. 770, 69 N.Y.S.2d 397 (App. Div. 1947); Duncan v. John Hancock Mut. Life Ins. Co., 137 Ohio St. 441, 31 N.E.2d 88 (Sup. Ct. 1940). Leube v. Prudential Ins. Co. of America, 147 Ohio St. 450, 72 N.E.2d 76, 2 A.L.R.2d 936 (Sup. Ct. 1947), followed the ruling in Duncan, supra, that a premium receipt constitutes interim insurance, but held that an uncommunicated rejection by the Home Office prior to the occurrence of the injuries resulting in death, instantly terminates the liability. Such rejection by "talking to oneself" was criticized in 60 Harv. L. Rev. 1164, 1165 (1947).
Contra: In many jurisdictions the applicant is required to be insurable at the time of making application in order to effectuate a binding contract. Mofrad v. New York Life Ins. Co., 206 F.2d 491 (10 Cir. 1953); Wolfskill v. American Union Life Ins. Co., 237 Mo. App. 1142, 172 S.W.2d 471 (Ct. App. 1943). Some receipts require that this *105 condition exist at the time of the medical examination and, if the company rejects the application because of the applicant's uninsurability at that date, no liability arises thereunder. See also New England Mut. Life Ins. Co. of Boston, Mass. v. Hinkle, 248 F.2d 879 (8 Cir. 1957), certiorari granted 356 U.S. 901, 78 S.Ct. 560, 2 L.Ed.2d 579 (1958), writ dismissed per curiam as improvidently granted, 358 U.S. 65, 79 S.Ct. 116, 3 L.Ed.2d 106 (1958), where the court applied the Iowa law and held that an airplane pilot did not receive interim coverage since he was not insurable at the rate and on the plan applied for; Adolf v. Union National Life Ins. Co., 170 Neb. 38, 101 N.W.2d 504 (Sup. Ct. 1960), where, although factually distinguishable, the court rejected the Gaunt approach, held the receipt unambiguous and concluded that the applicant was not insurable and was not approved.
In Reck v. Prudential Ins. Co., 116 N.J.L. 444 (E. & A. 1936) plaintiff's decedent applied for insurance and upon payment of the first month's premium received a receipt from the agent. By its terms the insurance took effect from the date of the application provided that the application was approved and accepted at the Home Office of the insurer and that the applicant was in sound health at the date of the application. The receipt further provided that the company would return the premium if it declined to grant the policy. The decedent died within two days of the delivery of the receipt. The jury could have found the insurer never returned the premium. The court there said, at pp. 445-447:
"By the terms of this receipt it will be noted that the insurance was to take effect on the date of the application which was May 9th, 1933, subject to two conditions (1) that the applicant was in sound health at that date (which is not in dispute); and (2) that the application be approved and accepted by the company at its home office in Newark, to which is added that the company would return the premium if it declines to grant the policy.
It will thus be seen that the application and the payment of the first month's premium, made simultaneously, effected the insurance *106 unless one of the two things occurred. The assured was in concededly sound health. It was, therefore, we think, incumbent on the company, if for that or any other reason the insurance be declined by the home office, to manifest this intention by the return of the premium within a reasonable time; otherwise the applicant could assume that his insurance was effective. Contracts may be implied from circumstances as well as by written papers and oral agreement, and insurance contracts are no exception to the rule as numerous cases, text books and digests clearly attest. * * *
What was a reasonable time within which the premium could be returned and the applicant thus apprised that the insurance had been declined, would be a question of fact to be determined in the particular case.

* * * * * * * *
We are not impressed with the contention that there must have been actual formal approval by the company at its home office; this could be inferred from retention of the premium; nor with the contention that there must have been a formal policy actually issued and delivered. * * *

* * * * * * * *
Nor could the death of the insured within two days of the application and delivery of the receipt as contended for by the appellant, affect the result. The insurance by the very terms of the receipt became effective on the date of the application and the payment of the premium unless the premium be returned, and the contract must in consequence speak as of that date. Kozloski v. Prudential Insurance Co., 95 N.J.L. 101. If the insurance was then effective the death of the insured at a later date could not impair the rights of the insured or those holding under him." (Emphasis added)
In Reck the decedent was in sound health when he made the application. However, the court indicates that the insurance by the very terms of the receipt became effective on the date of the application and payment of the premium, subject to a right of termination by a return of the premium within a reasonable time. Thus the condition is not a condition precedent, rather a condition subsequent. A seemingly contrary view was expressed in Hemhauser v. Metropolitan Life Ins. Co., 106 N.J. Eq. 15 (Ch. 1930), where in dictum or, as an alternative holding, the court stated that the receipt was not effective as a contract of insurance except upon approval of the application. This decision is of questionable authority in the light of Reck.
*107 When the terms of an insurance contract are simple and clear, it is the function of the court to enforce it as written. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 44 (1960). Our courts, however, recognize that insurance contracts, prepared by the insurer, contain clauses which, if read literally, do not afford the protection the insured reasonably believed he had bargained for. In this connection it was recently held that:
"When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances nor to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded `to the full extent that any fair interpretation will allow.' * * * Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective." Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475 (1961).
The receipt holder is entitled to the broad measure of protection necessary to fulfill his reasonable expectation. He should not be subjected to technical encumbrances or hidden pitfalls. The receipt in question may be unambiguous to an underwriter, but not so to the average layman. He may conclude therefrom that if he paid the advance premium, he would enjoy protection until his application is either accepted or rejected. He might reasonably believe that the receipt encompasses insurance at whatever standard rates are applicable to rated applicants. It is unconscionable to permit the company, after using language to induce payment of a premium, to escape the obligation which an ordinary applicant would reasonably believe had been undertaken by the insurer. Ransom, supra. In the instant case Mr. De Chiaro took his medical examination two days before he signed the application and paid the premium. Normally, the applicant for life insurance signs the application and the medical examination follows. Here the procedure was reversed. Could it be that the company's agent desired to *108 ascertain the insurability of the applicant prior to accepting his application and premium payment? In any event, under the stated circumstances, Mr. De Chiaro had reason to believe that he had successfully passed his examination, and that upon signing the application and making his premium payment he had acquired interim insurance. It is urged that such holding commits the insurer to an agreement it did not bargain for. However, this was the calculated risk the insurer took in accepting the premium payment in an endeavor to hold the insurance applicant and remove him from competing influences. See 5 Utah L. Rev. 131 (1956). In any event since the insurer created the ambiguity, it should bear the consequences.
Unless the receipt holder is to be protected against death during the interim period, there is no substantial advantage to him in paying the premium in advance. The advantage is to the insurance company which may accept or reject a risk dependent on intervening developments. Should it elect to accept the risk, it is thus enabled to collect premiums for the period during which there was in fact no insurance and no risk. See 7 Stan. L. Rev. 292 (1955). I hold that under the stated circumstances the receipt afforded interim coverage.
Plaintiff declined decedent's application upon being erroneously apprised of his death. Until the onset of his terminal illness, it had not reached a final decision as to whether decedent was an acceptable risk. Hence, the receipt at this point afforded him interim insurance. The attempted rejection of the risk made after commencement of decedent's obviously mortal illness came too late. Cf. Metropolitan Life Ins. Co. v. Grant, supra, 268 F.2d, at p. 310. It therefore need not be decided whether a contract of interim insurance can be terminated only by actual notice of rejection to the applicant and return of the premium payment, although this appears to be the holding in Reck, supra. See also Colorado Life Co. v. Teague, 117 S.W.2d 849 (Tex. Civ. App. 1938); Mohrstadt v. Mutual Life Ins. *109 Co. of New York, 115 F. 81, 85 (8 Cir. 1902) (dictum); Liberty National Life Ins. Co. v. Hamilton, supra; Chief Justice Weygandt's dissenting opinion in Leube, supra, 72 N.E.2d, at p. 80. In the instant case this was not accomplished in the lifetime of the applicant. In appropriate instances notice of rejection affords the applicant the opportunity to seek protection elsewhere.
Accordingly, plaintiff's motion for summary judgment is denied. Plaintiff urges as an additional ground for relief and as a defense to the counterclaim material misrepresentations allegedly made by decedent in his application, which defendant denies. This factual issue was not presented in any of the affidavits filed on the cross-motions for summary judgment, and therefore remains in the case. Defendant's cross-motion for summary judgment on the counterclaim is accordingly denied.
An appropriate order will be submitted, consented to as to form or to be settled on notice.