83 N.J. Super. 223 (1964)
199 A.2d 254
ANNE D. ALLEN, AS EXECUTRIX OF THE ESTATE OF HARLEY ALLEN, DECEASED, AND ANNE D. ALLEN, INDIVIDUALLY, PLAINTIFF-RESPONDENT,
v.
METROPOLITAN LIFE INSURANCE COMPANY, A CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted January 13, 1964.
Decided April 6, 1964.
*225 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. Eugene M. Haring appeared on behalf of appellant (Messrs. McCarter & English, attorneys; Mr. Haring on the brief).
Mr. Joseph J. MacDonald appeared on behalf of respondent (Messrs. Hein, Smith & Mooney, attorneys).
The opinion of the court was delivered by COLLESTER, J.A.D.
Defendant Metropolitan Life Insurance Company appeals from a judgment of the Law Division, following a non-jury trial, awarding plaintiff Anne D. Allen damages in the sum of $12,000, together with lawful interest thereon from June 1, 1960. The award represented the face value of a policy of life insurance for which plaintiff's husband, Harley Allen, had made application, naming plaintiff *226 as his beneficiary. Harley Allen (hereafter referred to as the decedent) signed the application, paid the first full annual premium and received a conditional receipt therefor. He died before the application was formally approved by the defendant insurance company, which subsequent to his death refused to issue the policy applied for.
Plaintiff, as executrix of decedent's estate, and individually as beneficiary named in the application, brought suit. In a four-count complaint she alleged that (1) defendant breached an agreement with decedent to issue a $12,000 life insurance policy in consideration of decedent's paying a premium of $576.42; (2) defendant, by not returning the premium within a reasonable period of time, led decedent to believe that the insurance policy applied for was effective; (3) defendant negligently failed to notify decedent of its alleged rejection of the application, wherefore decedent assumed he had been accepted as an insurance risk and that the policy would issue, as a result of which he made no attempt to secure insurance from another company, and (4) defendant fraudulently represented to decedent that upon payment of the premium he was immediately insured for $12,000.
The pertinent facts are as follows. On April 4, 1960 Frank J. Cafaro and Richard F. Tambouri called at the home of Allen in Hillsdale, New Jersey, for the purpose of selling him a life insurance policy. Cafaro was assistant manager of the Westwood district office of defendant, and Tambouri was an agent in said office. Also present at the interview, in addition to Allen, were plaintiff and Joseph Daskivich, plaintiff's brother.
Decedent agreed to purchase a whole life policy with a face amount of $12,000 in which plaintiff was to be named beneficiary. Part A of the application, consisting of personal data required of the applicant, was filled out by Tambouri, who asked questions of Allen and wrote the answers on the application, which was then signed by decedent. Part A contains the following provision:
*227 "4. The Company will incur no liability by reason of this application, except as may be provided in a Conditional Receipt given on and bearing the same date as this application, until a policy has been delivered and the full first premium specified in the policy has actually been paid to and accepted by the Company during the lifetime and continued insurability of the Applicant, in which case such policy will take effect as of the date of issue recited therein." (Emphasis added)
Upon signing the application decedent gave Tambouri a check in the amount of $576.42 in payment of the first annual premium, and the latter then signed and turned over to decedent a conditional receipt.
The conditional receipt issued pursuant to the above-stated provision in the application, provides:
"If the amount received on this date is equal to the full first premium on the policy applied for and (1) the application as originally submitted is approved at the Company's Home Office for the policy applied for, either before or after the death of the Life Proposed, then in such circumstances the policy applied for will be issued effective as of this date or (2) if the Life Proposed dies within 30 days from this date as a result of accidental bodily injury caused by external violence, then, provided that a death benefit does not become payable under a policy issued pursuant to (1) above or under a policy other than the one originally applied for, the Company will pay the amount of life insurance applied for (not including any additional accidental means death benefit) subject to the following conditions: (a) the aggregate amount payable under this provision and similar provisions of all conditional receipts issued by the Company in connection with applications on the Life Proposed shall not exceed $25,000, (b) payment will be made in one sum to whoever would have been entitled to payment if a policy had been issued, (c) no such payment will be made if death occurs as the result of suicide.

* * * * * * * *
The amount received will be refunded if the application is declined or if a policy is issued other than as applied for and is not accepted." (Emphasis added)
Harley Allen was 52 years of age on the day he signed the application. Since the defendant insurance company would not issue a life insurance policy to one of that age without a medical examination, a discussion ensued concerning an appointment for such an examination by Dr. William Spranz of Oradell, defendant's examining physician.
*228 On April 8, 1960 decedent was examined by Dr. Spranz and Part B of the application pertaining to the applicant's medical history was filled out and signed by Allen. Decedent disclosed that less than three weeks before he had signed Part A of the application, he had been hospitalized in the Pascack Valley Hospital for a period of seven days, beginning March 11, 1960, and that he had been absent from work until March 24. Part B contains the following recital:
"Mar. 11, 1960. Complained of pain localized to pit of stomach. Pain severe admitted to Pascack Hospital, Westwood, N.J. Had electrocardiogram twice, gastro intestinal X-rays and gall bladder X-rays. Only positive finding sluggish gall bladder. Treatment low fat diet  still on diet plus medication. No recurrence of pain. No present symptoms. Hospitalized 7 days."
Dr. Spranz' report of his medical examination of decedent, set forth on Part C of the application, was essentially negative except for a finding that the applicant was overweight.
The application containing Parts A, B and C was sent to the home office of the insurance company in New York, where it was received on April 12, 1960. Thereafter it was processed through several underwriters. On April 19 Gerald Chamberlin, a senior underwriter, sent for and reviewed Allen's application for another policy which had been issued to him in 1957. On April 21 Chamberlin sent the application for the present policy to the medical division with a direction that a hospital report be obtained from the Pascack Valley Hospital concerning the applicant's previous treatment.
On April 28 the medical correspondence division sent a written request to the hospital for a report of the treatment rendered to decedent, including results of the electrocardiogram and X-rays. Attached to said letter was a written authorization, which had been signed by decedent on April 8, directing that information relating to medical care and findings made be furnished to defendant. The hospital report, dated April 28, 1960, was received at defendant's home office on May 2, 1960. On May 3 Francis Baldwin, a staff underwriter, while processing the application made a notation *229 thereon as a reminder that the applicant's gall bladder history would require an extra premium, if the application was approved. He thereupon sent the application to the medical division for action by a medical doctor.
On May 5, 1960 the application was received by Dr. Paul S. Entmacher, defendant's associate medical director. He also had before him the report from Pascack Valley Hospital of Allen's condition and treatment during his hospitalization from March 10 to March 17, 1960. The report contained a diagnosis of acute cholecystitis and anginal syndrome. It stated that Allen suffered from substernal pain and had been given demerol on his admission. It further stated that he had received oxygen by nasal catheter and had been put on complete bed rest. The history of Allen having indicated an acute gall bladder condition and an anginal syndrome within two months before the doctor's review of the records, Dr. Entmacher declined to approve the application. His action was based on a company practice that an applicant who had suffered an anginal syndrome within six months prior to the application was not insurable, and that a combination of an acute gall bladder condition and anginal syndrome offered an even more compelling reason to decline the application.
On April 28, 1960 at about 5:10 A.M. Allen was stricken and died as a result of a coronary occlusion. (It is conceded that Dr. Entmacher was informed of Allen's death by a telephone call from Dr. Spranz on May 5, the day he declined to approve the application.)
Tambouri, unaware of Allen's death, had telephoned defendant's home office on April 28 to ascertain what was holding up approval of the application and learned that the medical division had requested a report from the hospital. He then telephoned the hospital to ask them to expedite the information. He thereafter telephoned the Allen home and spoke to Joseph Daskivich, plaintiff's brother, about having the hospital records sent to the home office. He was advised by Daskivich that Allen had died earlier that day. Tambouri reported Allen's death to one Nezzi, manager of the Westwood *230 office, who in turn telephoned defendant's home office to report the same.
On May 12 or 15, 1960 Tambouri and Nezzi went to Mrs. Allen's home and turned over to her a check for the proceeds of an insurance policy covering the life of the decedent, which had been issued in 1957. The 1960 application having been declined by the insurance company on May 5, they also tendered a check of $576.42 for return of the premium paid by decedent on April 4. It was refused by Mrs. Allen. Upon failure of defendant to pay plaintiff the face amount of the $12,000 policy, suit was instituted.
The trial court determined that the language of the conditional receipt was ambiguous and that the ambiguity must be resolved against defendant. Over the objection of defendant, the court permitted in evidence conversations between the decedent and defendant's representatives held on April 4, 1960 when the application was signed and the conditional receipt issued. In his oral opinion the trial judge stated that he allowed such testimony, not for the purpose of varying the terms of the written instruments, but to explain the circumstances under which the parties came together and to help decide and resolve whatever ambiguity might exist.
The judge noted that plaintiff and Daskivich stated there was an agreement for immediate coverage of decedent under the policy, while Tambouri and Cafaro, defendant's representatives, had stated that there was immediate coverage "provided there was nothing organically wrong" with decedent.
The court stated that the conditional receipt contained no condition that decedent must be insurable, and held that regardless of whether he was or was not insurable on the date of the application, he was covered by interim insurance. The trial judge found no evidence that decedent was uninsurable. He held that defendant did not show decedent was uninsurable under its "Impairment Guide," and that Dr. Entmacher's finding of uninsurability was influenced and motivated by the fact that he knew Allen was deceased at the time he made *231 such determination. He also found there was undue delay in processing the application.
Defendant contends that decedent was not insurable on the date the application was made; that the application would have been rejected regardless of his death; and that the determination by defendant that the applicant was not insurable was made in good faith and independently of the fact that the applicant had died. It alleges that the conditional receipt was binding only to the extent that if the application had subsequently been approved, life insurance coverage would have been retroactive to the date of the receipt.
Defendant asserts that the terms of the conditional receipt were not ambiguous; that it did not provide for interim insurance, and that plaintiff is bound by the terms of the receipt and the application. It further contends that plaintiff failed to prove a breach of contract by defendant. It also alleges that the time required for investigation of the applicant did not constitute negligent delay.
Plaintiff contends that the terms of the conditional receipt were ambiguous; that the proofs showed the existence of a contract for interim life insurance coverage of decedent by defendant; that decedent was an insurable risk; that defendant's failure to reject the application within a reasonable time entitled plaintiff to judgment; and that defendant is estopped from denying liability by reason of its agents' representations of immediate coverage.

I.
We consider first the pivotal question of whether the provisions of the conditional receipt issued to the decedent were ambiguous. Conditional receipts generally fit into two main categories: (1) insurable risk type, and (2) approval type. See Comment, "Life Insurance Receipts: The Mystery of the Non-binding Binder," 63 Yale L.J. 523, 528 (1954). With the insurable risk type, coverage commences when the first premium is paid and the binder is issued, if the applicant is insurable under the company's rules. With the approval type, *232 coverage commences when the first premium is paid and the binder is issued, if the company approves or accepts the application at its home office. Either type protects the company from an applicant's change of mind, but "writers have suggested that only the insurable risk type protects the applicant in the interval between completion of the application and issuance of the policy." 63 Yale L.J., supra, at p. 528.
It might appear from the foregoing that insurance companies would favor the approval type of receipt as the one which would put the determination of coverage more squarely within a company's control, and be less susceptible to the imposition of external standards such as might be applied in determining "insurability." An application subject only to "approval" would preserve for the company its right to use any reason, or to give no reason, in declining coverage. But whatever may be the preference of insurance companies, the courts in recent cases have shown a tendency, regardless of the type of binder in question, to allow recovery if the applicant was an insurable risk. This has been attributed to an "increasing judicial awareness of the necessity of protecting the applicant," 63 Yale L.J., supra, at p. 535, and is a judicial preference distinct from the traditional rule of construction that ambiguity be resolved against the drafter.
The conditional receipt in the present case makes no reference to "insurability." On its face it is the approval type; however, insurability should be implied. But the judicial tendency to favor the applicant by imposing an insurability requirement on an approval-type binder will not help the beneficiary to recover if the applicant was uninsurable. The death of an uninsurable applicant should not burden the company with a risk which, in the ordinary course of its business, it would not have accepted. "When the applicant is not an acceptable risk, courts read an insurable risk requirement into approval binders." 63 Yale L.J., supra, at p. 531.
It is conceded that the conditional receipt issued in the instant case appears to be unique among the reported cases. *233 Events which may intervene between the dates of its issuance and of approval or disapproval have no relevance; the receipt imposes an obligation upon the defendant company to make its determination of approval or disapproval whether the applicant be living or dead.
There are many cases dealing with conditional receipts, but their use as precedents is of questionable value, not only because of varying circumstances but because the terminology of the binder varies from case to case. See Annotation, "Temporary Insurance," 2 A.L.R.2d 943, 959-960, § 9. In similar cases, where the conditional receipt provided for an independent determination by the insurance company of the applicant's insurability, regardless of intervening events following its issuance, and where the court found that the company made a good faith determination of uninsurability, recovery has not been allowed. See New England Mutual Life Ins. Co. of Boston, Mass. v. Hinkle, 248 F.2d 879 (8 Cir. 1957), cert. denied 358 U.S. 65, 79 S.Ct. 116, 3 L.Ed.2d 106 (1958); Mofrad v. New York Life Ins. Co., 206 F.2d 491 (10 Cir. 1953); Adolph v. Union National Life Ins. Co., 170 Neb. 38, 101 N.W.2d 504, 509 (Sup. Ct. 1960).
The principal New Jersey case on the subject of the legal effect of a conditional receipt is Life Ins. Co. of No. America v. DeChiaro, 68 N.J. Super. 93 (Ch. Div. 1961). In that case the court cites Gaunt v. John Hancock Mut. Life Ins. Co., 160 F.2d 599 (2 Cir. 1947), cert. denied 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (1947), with approval as exemplifying the modern trend to hold receipts, similar to the one there in issue, ambiguous and to resolve the ambiguity against the insurer. In Life Ins. Co. of No. America and Gaunt, the receipts provided for coverage from the date of the application if the company (a) was satisfied that the applicant was insurable and (b) approved the insurance at its home office. In addition, in Gaunt approval was required prior to the death of the applicant in order for coverage to be effective.
Gaunt is distinguishable from the case sub judice. That part of the conditional receipt in Gaunt which is particularly *234 objectionable requires approval before the applicant dies. Thus the applicant might be insurable and have otherwise met all requirements for insurance, yet be killed accidentally before his application is approved and thereby lose all benefits of coverage. This is precisely what happened in Gaunt. The applicant, who was shot prior to the approval of his application, was one whose application (as found by the trial court) would have been approved had he lived. No similar provision for approval before death exists in the present case. (As to Allen's insurability, more will be said later.)
The Second Circuit in Gaunt speaks of "the ordinary applicant who has paid his first premium and has successfully passed his physical examination." 160 F.2d, supra, at p. 602; (emphasis added). In other words, the court is considering a person already found "insurable" by the insurance company. In the present case Allen was clearly not such a person.
Finally, the court in Gaunt found the receipt to be ambiguous. In his concurring opinion Judge Clark leaves no doubt that the majority opinion is made to rest on the question of ambiguity, and his urging for a broader view of coverage is not heeded by the majority.
Life Ins. Co. of No. America v. DeChiaro, supra, is also distinguishable from the instant case. DeChiaro took his medical examination two days before he signed the application, paid his premium and accepted his conditional receipt. Four days after he signed the application he suffered a rupture of a congenital aneurysm and was hospitalized. On the following day the company was erroneously informed that DeChiaro had died from a heart attack, and the underwriter, who was reviewing the application, immediately declined to approve it. The evidence indicated that DeChiaro was insurable on a rated basis. Based on the circumstances which were presented in the case, the trial court found that DeChiaro had reason to believe that he had successfully passed the medical examination, and that upon signing the application and making his premium payment he had acquired interim insurance. The court further indicated that the company had not made *235 a good faith determination of the applicant's insurability, independently of the intervening developments. It held that the language of the conditional receipt (which differs from that in the instant case) was ambiguous.
In the present case Allen, under the provisions of his signed application, was bound by the terms of the conditional receipt which required approval of the application by the company at its home office either before or after his death  an objective test not dependent upon intervening events. He knew coverage was subject to passing a medical examination. He also knew, when he was examined by Dr. Spranz, that the company intended to examine the record of his illness for which he had been hospitalized less than four weeks before. In fact, on the date of his examination, he signed the necessary authorization directing that such information be provided to the company by the hospital. Under the terms of the receipt Allen was immediately covered to the extent of $12,000 for accidental death for a 30-day period.
For either Gaunt or Life Ins. Co. of No. America to be applicable here the language in the conditional receipt must be found to be ambiguous.
According to Webster's New International Dictionary (2d ed.), "ambiguous" means "doubtful or uncertain," "inexplicable," "capable of being understood in either of two or more possible senses." As we read the pertinent language it states simply that if the applicant pays the first annual premium when the conditional receipt is issued, and the application is approved at the company's home office, either before or after the applicant's death, the policy is effective as of the date of the application. The succeeding language (which has no bearing on this case) then provides that if the cause of death is accidental injury within 30 days of the issuance of the conditional receipt, the company will pay the amount of life insurance applied for, regardless of whether the policy is approved.
The trial court in arriving at its decision that decedent was covered by interim insurance placed great reliance upon Life *236 Ins. Co. of No. America v. DeChiaro, supra. It held that the conditional receipt was ambiguous and that the ambiguity would be resolved against defendant.
In Tomaiuoli v. United States Fidelity and Guaranty Co., 75 N.J. Super. 192 (App. Div. 1962), the court said:
"Liberality in the construction of an agreement against the drafter when ambiguity appears, or when strict construction would contravene public policy, is a salutary principle. But it should not be used as an excuse to read into a private agreement that which is not there, and that which people dealing fairly with one another could not have intended. So employed, it debases the law." (at page 207)
It is also well settled that when the terms of an insurance contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960).
We cannot agree with the conclusion of the trial court. To accept the court's finding we would have to disregard a written agreement entered into between decedent and defendant and hold that an insurance company is liable for interim coverage, even though the applicant may be uninsurable. We do not find this conditional receipt to be ambiguous.

II.
The determination of the trial court that decedent and defendant had entered into a contract for interim life insurance coverage was based primarily upon testimony of conversations on April 4, 1960 between decedent and defendant's representatives, Tambouri and Cafaro. Defendant objected to the admission of such testimony at the trial and alleges that the court erred in its admission.
The written agreement between the parties was comprised of the application which decedent signed, and the conditional receipt (referred to in the application) which was issued to decedent.
*237 Part A of the application contained a statement that no agent, medical examiner, or any other person, except the president, vice-presidents, or secretary of the company has power on behalf of the company (a) to make, modify or discharge any contract of insurance or (b) to bind the company by making any promises respecting any benefits under any policy issued hereunder.
Defendant had the right to limit the power and authority of its own agents. Third parties dealing with the agents, with notice of the limitations thus imposed, could not bind the defendant by any act done by its agents in excess of the bounds of their authority. Metropolitan Life Ins. Co. v. Coddington, 131 N.J. Eq. 430, 433-434 (Ch. 1942); McClave v. Mutual Reserve Fund Life Asso., 55 N.J.L. 187, 189 (Sup. Ct. 1893); Catoir v. American Life Ins. and Trust Co., 33 N.J.L. 487, 491 (E. & A. 1868); cf. Dimick v. Metropolitan Life Ins. Co., 69 N.J.L. 384, 395 (E. & A. 1903).
Neither Tambouri nor Cafaro held any of the above-named offices in the defendant company. They had no power or authority to enter into a contract for interim coverage of the decedent which would be binding upon defendant.
It is also well settled that parol evidence is not admissible to contradict, vary or alter the terms of a written agreement between parties. Massari v. Accurate Bushing Co., 8 N.J. 299, 316 (1951); Korb v. Spray Beach Hotel Co., 24 N.J. Super. 151, 157 (App. Div. 1952); Downs v. Jersey Central Power & Light Co., 117 N.J. Eq. 138 (E. & A. 1934); Naumberg v. Young, 44 N.J.L. 331 (Sup. Ct. 1882). The rule has its exceptions. When the language of a contract is ambiguous or otherwise doubtful, parol evidence is admissible, not to contradict, alter or vary the terms of the written agreement, but rather to explain the real intent of the parties. Meserve v. Traverso, 119 N.J.L. 566 (E. & A. 1938). But where the language employed has an ordinary meaning or where the meaning is plain and unambiguous on its face, there is no ground for the application of the rule, as *238 stated in Meserve, supra, and parol or extrinsic evidence is inadmissible. Central Hanover Bank and Trust Co. v. Herbert, 1 N.J. 426, 429 (1949).
Nor was there any proof of fraud on the part of defendant or its agents which would permit such evidence to have been received.
We have determined that the language contained in the application and conditional receipt, which comprised the written agreement between the parties, was not ambiguous. Accordingly, it was error on the part of the trial court to admit as evidence the conversation between decedent and defendant's representatives.

III.
Defendant contends that it properly rejected decedent's application on May 5, 1960, because he was not insurable on the date the application was signed. We have already indicated insurability of the applicant is an implied condition for the issuance of the policy. Accordingly, the evidence must be examined to see if defendant's rejection of the application on such ground was made in good faith.
In the processing of an application for life insurance, each of defendant's underwriters, whether lay or medical, has use of a book prepared by the company known as the "Medical Impairment Guide." The book contains a list of medical impairments and the appropriate action that shall be taken by underwriters, in their respective echelons, when an application contains a history of medical illness. It is a guide to aid an underwriter in exercising his judgment. If the ailment is not listed in the guide, the underwriter must use his own judgment, based on his experience, in passing upon the insurability of the applicant.
In the instant case the decedent had a medical history, revealed in the hospital report received by defendant, of anginal syndrome and acute cholecystitis (inflammation of the gall bladder). Anginal syndrome is defined as angina pectoris and is described as "the pain and other symptoms of *239 chronic myocardial disease." See Dorland, American Illustrated Medical Dictionary, page 1437 (referred to in the testimony).
Defendant's "Medical Impairment Guide" lists angina pectoris, which refers the underwriter to insurance ratings prescribed for coronary occlusion. The rating is "D-450" which means that the underwriter, based on the medical history of the applicant, can decline the application or approve it on the basis of a substandard rating requiring a substantial increase in premium.
Dr. Entmacher, who made the final review of the application on May 5, 1960, declined to approve it. On that date he had been informed by Dr. Spranz that Allen had died on April 28. He testified that such information did not affect his action. He said that it was an established company practice to refuse approval to all applicants who had suffered an anginal syndrome within six months of the date of the application and that, in addition, a combination of anginal syndrome and a gall bladder condition was uninsurable. He further stated that the report from the hospital showed that Allen had been administered oxygen by nasal catheter, indicating a serious type of anginal syndrome.
The doctor further testified that in exercising his judgment on insurability of applicants, he had approved coverage "in about a half a dozen cases" knowing the applicant was already deceased.
The trial court, having determined that the conditional receipt was ambiguous and that decedent was covered by interim insurance, indicated that insurability of the applicant was not an issue. However, the court did make a finding of fact that defendant did not show that decedent was uninsurable "as far as the actual impairment guide is concerned," and that the question of insurability "would depend on somebody's opinion afterwards." He found that the opinion of Dr. Entmacher, declaring the applicant was uninsurable, "was influenced and motivated by the fact that the man had actually died."
*240 We are reluctant on appeal to overturn the conclusions of the trier of the facts. We will not do so unless it is our conviction that such conclusions are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice. New Jersey Highway Authority v. J. & F. Holding Co., 40 N.J. Super. 309, 317 (App. Div. 1956). However, in the present case, we find no logical basis for the finding of fact of the trial court that there was no proof that the decedent was uninsurable.
We are satisfied that the trial judge made an erroneous conclusion in his consideration of the uncontradicted evidence presented in this case. He obviously believed that the basis of Dr. Entmacher's rejection of the application was influenced by the knowledge that Allen had died before the doctor considered, and then declined, the application. The court indicated that "it would be somewhat more than human, in his position as associate medical director" upon receiving word that Allen was dead, for the doctor to approve the application. The court said:
"I think that under those circumstances for him, Dr. Entmacher to say, `Oh, he is insurable. He is all right. I am going to allow this policy,' well, the human animal is not quite made up that way. I say this not in any criticism because I am sure that he acted in all sincerity but he acted under conditions that certainly could not be termed in any sense favorable and perhaps downright prejudicial to the interests of the plaintiff."
We note that the trial judge did not question the veracity of Dr. Entmacher. He did not state that the credibility of the witness was beyond belief. He stated that he was sure that Dr. Entmacher acted in all sincerity. However, the judge assumed that Dr. Entmacher could not make an objective decision on the records before him with knowledge that the applicant was already deceased.
Where a trial judge indicates a belief that the witness acted in all sincerity, we do not find evidence of bad faith. *241 We think that the judge may not destroy such testimony by his personal assumption that the witness could not make an objective decision, based on a hospital report, in view of knowledge on the part of the witness that the applicant had died.
It cannot be gainsaid that a life insurance company has the right to establish policies respecting the insurability of an applicant. It is common knowledge that the age and medical history of the applicant determine whether he is insurable or not.
The evidence in this case is unchallenged that it was defendant's established practice not to insure an applicant who had suffered from an anginal syndrome within a six-month period prior to the application's having been made. In view of such established practice, it is clear that Dr. Entmacher did not exercise his own discretion in rejecting the application. In the light of the established company practice, he could not have done otherwise. Knowledge of the applicant's death at the time of rejection could not have affected the doctor's action.
Here the applicant admittedly had sustained an anginal syndrome within four weeks before he signed his application. He was clearly uninsurable. It is further uncontradicted that an applicant with a medical history of both an anginal syndrome and a gall bladder ailment was uninsurable.
We are satisfied that the determination of the trial court that decedent was insurable and that there was no evidence of uninsurability in this case was erroneous.

IV.
The trial court, in determining that the conditional receipt gave interim coverage to decedent, held that there was an unreasonable delay by the company in its rejection of the application.
A review of the record shows the following sequence of events after decedent signed the application on April 4, 1960. *242 He was subjected to a medical examination by Dr. Spranz on April 8, at which time it was revealed that he had been hospitalized from March 10 to March 17. The application containing the report of Dr. Spranz arrived at the New York office of defendant on April 12. It then was processed through various underwriting channels, commencing with Mr. Clancy, a review underwriter, who referred it on April 13 to a Mr. Sherwood, a medical underwriter, who on April 18 sent it to Mr. Chamberlin, a senior medical underwriter. Chamberlin sent for the application for a previous policy which had been made by decedent and received it on April 19. On April 21 Chamberlin sent the application to the medical correspondence section of the medical division, directing that a statement be obtained from Pascack Valley Hospital. The request was made and the hospital report dated April 28 was received at the home office on May 2. Francis Baldwin, a senior underwriter, noted on the application that an extra premium charge because of decedent's gall bladder condition would be required, if the application was approved, and referred the file for review by a medical doctor in the medical division. Dr. Entmacher reviewed and rejected the application on May 5. On May 12 or 15 defendant's agents notified plaintiff of the rejection and tendered a return of the premium.
Plaintiff relies upon Reck v. Prudential Ins. Co. of America, 116 N.J.L. 444 (E. & A. 1936), in contending that defendant should be held liable because it failed to make a determination on the application within a reasonable time before Allen's death.
We do not find Reck apposite. There, the decedent was insurable on the date the application was signed. The company was not obligated to make a good faith determination on the application, independently of events occurring subsequent to making of the application, as in the instant case. The company was held liable on an implied contract based upon its failure to return the premium and to notify the applicant of its rejection within a reasonable time.
*243 In the case sub judice, no evidence was offered by plaintiff to show that the underwriting procedures of defendant were unreasonable or dilatory.
Here defendant, when the application was received at its home office, became possessed of information which was incomplete, in that it did not indicate whether or not decedent was insurable. It had a right, and a duty, to make a further investigation and undertook to conduct the same.
However, it will be noted that the recital in Part B of the application indicated that decedent had been hospitalized on March 11 only for a "sluggish gall bladder," a condition which does not render the applicant uninsurable, but requires an increase in premium rate. Defendant was not put on notice in Part B that decedent had suffered from a heart condition. It was not until May 2, when the hospital report was received, that defendant learned that decedent had also suffered from an anginal syndrome. The application was rejected three days later, on May 5. We are not satisfied that there was undue delay in this action on the part of the company. See Zielinski v. General American Life Ins. Co., 96 S.W.2d 1059 (Mo. Ct. App. 1936).
In any event, recovery is not permitted if the applicant is an unacceptable insurance risk. Delay will not fasten upon an insurer a windfall to the applicant or his survivors if he is uninsurable. Summers v. Prudential Insurance Co. of America, 337 S.W.2d 562, 565-566 (Mo. Ct. App. 1960); Gonsoulin v. Equitable Life Assurance Society of United States, 152 La. 865, 94 So. 424, 427 (Sup. Ct. 1922); North-western Mut. Life Ins. Co. v. Neafus, 145 Ky. 563, 140 S.W. 1026, 36 L.R.A., N.S., 1211 (Ct. App. 1911).
It is also to be noted that the conditional receipt issued to decedent contained a statement that if the policy was not delivered within 60 days, inquiry should be made of defendant for a refund. Such provisions have been held to provide a specific period, to which the parties have contracted, during which the company may make its investigation of the applicant. See Reese v. American National Ins. Co., 175 F.2d *244 793-794 (5 Cir. 1949); Debenport v. Great Commonwealth Life Insurance Co., 324 S.W.2d 566, 570 (Tex. Ct. Civ. App. 1959); New York Life Ins. Co. v. Lawrence, 56 Ariz. 28, 104 P.2d 165, 168 (Sup. Ct. 1940); Hughes v. John Hancock Mut. Life Ins. Co., 163 Misc. 31, 297 N.Y.S. 116, 122 (Mun. Ct. 1937), modified 254 App. Div. 570, 3 N.Y.S.2d 899 (App. Div. 1938).
We are satisfied that the evidence does not show negligence in the processing of decedent's application or that there was an unreasonable delay. To the contrary, we find that such procedure was within the reasonable contemplation of the parties at the time the application was made.
For the reasons set forth above the judgment entered in favor of plaintiff in the Law Division is reversed and judgment will be entered in favor of defendant.
GOLDMANN, S.J.A.D., concurring in the result.